[No. 1216.]

ALBION CONSOLIDATED MINING COMPANY, RESPONDENT, *v.* RICHMOND MINING COMPANY OF NEVADA, APPELLANT.

NEW TRIAL—AFFIDAVITS USED ON HEARING—INDORSEMENT.—Affidavits used on hearing of motion for new trial, and not indorsed by the judge or clerk "at the time as having been read or referred to on the hearing" of the motion for new trial, will be stricken from the statement on appeal. (*Dean* v. *Pritchard,* 9 Nev. 232, affirmed.)

STATEMENT ON APPEAL—MAPS AND MODELS.—Maps, models, and diagrams used to illustrate the evidence of the witnesses, but not put in evidence, need not be embodied in the statement on appeal.

IDEM—DEEDS—DOCUMENTARY EVIDENCE—TITLE.—Where deeds and other documentary evidence are introduced to show title, and not objected to at the time as insufficient, such deeds and documentary evidence need not be copied in full in the statement on appeal.

VOL. XIX.—15

Verdict—When should be Set Aside—New Trial.—Upon a review of the testimony: *Held*, that the verdict of the jury could not be sustained; that the court did not err in setting it aside and granting a new trial.

Appeal from the District Court of the Sixth Judicial District, Eureka County.

The facts are stated in the opinion.

*Wren & Cheney*, for Appellant:

*Baker & Wines*, and *Stewart & Herrin*. for Respondent:

By the Court, Hawley, J.:—

On the twenty-first day of October, 1873, E. H. Rose and others commenced an action in the district court of Eureka County against the Richmond Company (appellant herein), to determine the right of possession to certain mining ground. A trial of that case in 1881 in the district court resulted in a judgment for the Richmond Company, from which Rose took an appeal to this court. The real controversy in that action depended upon the question of the validity of the Uncle Sam location, owned by Rose and others, and of the St. George and Victoria locations, and patents therefor from the United States, owned by the Richmond Company. This court declared the St. George and Victoria patents to be " absolutely null and void," and directed the district court to render a proper judgment in favor of Rose and others for the mining ground westerly of the line "A C," as designated upon the diagram in evidence in that case. (*Rose* v. *Richmond M. Co. of Nevada*, 17 Nev. 25.) An appeal was taken from this decision to the supreme court of the United States, and that court, on the 4th of May, 1885, affirmed the decision of this court. (*Richmond M. Co.* v. *Rose*, 114 U. S. 576.)

The present action was brought to recover damages for the value of ore alleged to have been taken by the Richmond Company from the mining ground west of the line " A C." The complaint alleges that nine thousand two hundred and eight tons of ore were extracted and removed by the Richmond Company, of the value of sixty-five dollars per ton, amounting to the sum of five hundred and ninety-eight thousand five hundred and twenty dollars. It is further averred that by the working of

the mine plaintiff was damaged in the sum of ten thousand dollars, making a total of six hundred and eight thousand five hundred and twenty dollars. The jury before whom this cause was tried found a verdict in favor of platntiff for thirteen thousand two hundred and fifty dollars. The plaintiff, being dissatisfied with this verdict, moved the district court for a new trial, which was granted upon two grounds, viz.: " (1) Insufficiency of evidence to justify the verdict. (2) Irregularity of the defendant, by which plaintiff was prevented from having a fair trial." This appeal is taken by defendant from the order of the district court granting a new trial.

1.   The question whether there was any irregularity upon the part of appellant was, upon motion of appellant, eliminated from the case. It was presented upon affidavits which were not indorsed by the judge or clerk " at the time as having been read or referred to on the hearing" of the motion for new trial (Stat. 1869, 227, sec. 197), and upon the authority of *Dean* v. *Pritchard*, 9 Nev. 232, the affidavits were stricken from the statement on appeal.

2.   Appellant contends that the question whether the court erred in granting a new trial upon the ground of insufficiency of the evidence to sustain the verdict cannot be considered, because the statement, notwithstanding the recital therein that " the above and foregoing testimony was all the evidence offered and received in said action," affirmatively shows that it does not contain all the evidence. This contention is based upon the fact that the statement shows that a glass model of the mining ground was used at the trial in the district court to illustrate the testimony of the witnesses, and that certain maps and diagrams were referred to by the witnesses, which are not made a part of the statement on appeal. It is argued that, without the model, maps, and diagrams, a portion of the testimony will be unintelligible to this court. It does not appear from the statement that the model, maps, or diagrams, or either of them, were offered in evidence, hence they were properly excluded from the record on appeal. Upon the trial of important mining cases it is quite frequently the custom of litigants to exhibit a model of the mine to be used in the court-room, instead of asking for an order to have the jury take a " view of the premises," the models being constructed in such a manner as to show the various levels, drifts, tunnels, excavations, ore-

bodies, and such other matters as may be in controversy, and to enable the witnesses to illustrate their testimony by a reference thereto. Before these models came in vogue, it was, and if a model is not used, it is still, occasionally the practice to allow the jury to view the premises for the purpose of enabling them the better to comprehend the testimony of the witnesses; but the courts have never held that such a view was a part of the evidence in the case which must be included in the statement on appeal. It is allowed for the purpose of enabling "the jury, by the view of the premises or place, to better understand and comprehend the testimony of the witnesses respecting the same, and thereby the more intelligently to apply the testimony to the issues on trial before them, and not to make them silent witnesses in the case." (*Close* v. *Samm*, 27 Iowa, 508; *Wright* v. *Carpenter*, 49 Cal. 609.) If the model is intended to establish any independent fact, and is introduced in evidence, and used in the court below for that purpose, provision should be made to have it brought before the appellate court. In the present case the model was not intended to establish any fact, and was not used for any such purpose. If the maps and diagrams had been offered in evidence, they should have been embodied in the statement on appeal; but the fact that they, like the model, were only used for the purpose of illustrating the testimony of the witnesses, and as they were not intended to establish any fact in the case, it was unnecessary to offer them in evidence. In *People* v. *Cochran* the court said: "A diagram is not a public nor private writing, nor is it made by law primary or secondary or *prima facie* evidence of any fact or object represented by it. When used on the trial of a case, it is not used as evidence; it does not prove, nor tend to prove, in the sense of evidence, any fact; it is simply a figure drawn to suggest to the minds of the jurors the relation between objects about which a witness is testifying, and may be drawn on paper or on a stationary blackboard, which cannot be removed. The very construction of the figure itself is defined by the testimony of the witness, and is illustratory of his testimony; it partakes of it in the same way that the clearness of the expression of the witness partakes of his evidence." (61 Cal. 552.)

The statement recites the fact that "the defendant offered in evidence, for the purpose of showing its good faith in its entry

and removal of the ore in controversy, patents from the United States to the Victoria and St. George mining claims, which patents were issued by the government of the United States to the defendant before the ore in controversy was taken out, and were upon the same ledge and lode as the Uncle Sam claim, and covered the ground from which the ore in controversy was taken "; that the "plaintiff introduced in evidence notices of location of Uncle Sam, Albion, Nos. 1, 2, 3, and Albion Con- sonsolidated, and introduced mesne conveyances to show it was vested with the title of the original locators of said mining claims." The plaintiff also offered in evidence the judgment roll in *Rose* v. *Richmond M. Co.* This judgment roll does not contain the original judgment of the district court, which was reversed by this court, upon appeal.

Appellant argues that, because the patents, the notices of location and mesne conveyances, and the reversed judgment were not set out in full, the statement does not contain all the evidence. This position is purely technical and without merit. The omissions complained of are wholly immaterial. It was unnecessary to encumber the statement by copying the lan- guage of the patents, even if they had been offered to prove title, unless there was an objection made to their being admit- ted in evidence, which required an inspection of their contents. No objection was made to the notices of location or mesne con- veyances. The substance of the documents, as recited in the statement, is all that was necessary to be inserted in the record on appeal. "Instead of copying into a statement for a new trial, or on an appeal, deeds and transcripts of records, when no point is made on the construction of the language, a brief statement of the instrument answers every purpose." (*Knowles* v. *Inches*, 12 Cal. 214.) The judgment of the district court, which was omitted from the judgment roll, had been reversed by this court, and was without force or effect, and if it had been included, would not have added anything of value to the statement.

3. Appellant argues that the evidence is insufficient to justify any verdict in favor of respondent in this: that the statement fails to show any title in respondent to the mining ground at the time of the alleged trespass. This position can- not be maintained upon any sensible view of the evidence con- tained in the statement. The question of title was in issue

under the averments in the complaint and answer; but when the cause was tried, there was no controversy as to the ownership of the ground. The question had been settled by the decision of this court in *Rose* v. *Richmond M. Co.* True, the decision of the supreme court of the United States had not been rendered at the time of the trial of this case. The pendency of that appeal might have been sufficient cause for a continuance of this case; but until that decision was rendered it was certainly the duty of the district court to follow the decision of this court. The St. George and Victoria patents, having been declared absolutely null and void, would not have furnished any muniment of title in favor of appellant, even if they had been offered or considered in evidence for that purpose.

In the statement of the facts presented by the record on appeal in *Rose* v. *Richmond M. Co.*, it was stated by this court, in its opinion, "that at the time of the trial of this action the Albion Consolidated Mining Company was the owner of the Uncle Sam claim, and this action is prosecuted for its benefit by the consent of the plaintiffs." But the question did not depend alone upon the title as settled in that case. The statement, independent of the judgment roll in *Rose* v. *Richmond M. Co.*, affirmatively shows that respondent was the owner of the mining ground during the time of the alleged trespass. Respondent introduced in evidence the notice of location and mesne conveyances, hereinbefore mentioned, "to show it *was vested* with the title of the original locators of said mining claims." At what time was respondent vested with the title to this property? There is but one answer to this question. The issue as raised by the pleadings related to the ownership of the ground at the time of the alleged trespass, to wit, between the twenty-ninth day of December, 1879, and the twenty-seventh of May, 1882. The evidence offered, not having been objected to, must be considered as relevant and material to the issues presented by the pleadings. The statement that the locations and conveyances were introduced to show that respondent was vested with the title has reference to the period of time mentioned in the pleadings. The case was tried upon the theory that respondent was the real owner of the ground. The court so instructed the jury in explicit terms: "You are instructed that the documentary evidence produced by plaintiff is sufficient, and does establish its ownership of the mining

premises described in the complaint, lying westerly of the line A C, and you are instructed to consider the plaintiff is such owner, so far as this trial is concerned, and was such owner at all times between the twenty-ninth day of December, 1879, and the twenty-seventh day of May, 1882."

If the notices and conveyances offered were considered insufficient for the purpose of showing title at this time, objections should, and doubtless would, have been made in the court below.   In the absence of any objection to their sufficiency, it was, as before stated, unnecessary to copy the entire documents. "It is seldom necessary to insert an entire deed in a statement. When a conveyance is regular, and no question is made on it, it is sufficient to say in the statement that a deed of such a date, conveying the land from A to B, was introduced, *or that conveyances were introduced* showing that the title of A had become vested in B."   (*Kimball* v. *Semple*, 31 Cal. 664.)

4.   Did the court err in granting a new trial upon the ground of insufficiency of the evidence to justify the verdict?   There was a decided conflict of evidence, both as to the quantity and value of the ore extracted and removed by appellant.   The jury were primarily the judges of the credibility and weight of the testimony of the respective witnesses.   The district judge, however, "has jurisdiction, on motion for a new trial, to decide, as a question of fact, whether the scale of evidence which leans against the verdict very strongly predominates" (*Phillpotts* v. *Blasdel*, 8 Nev. 76), and if there is, in his opinion, a "clear preponderance of evidence against it," he "should not hesitate to set aside the verdict" (*State* v. *Yellow Jacket S. M. Co.*, 5 Nev. 422);   but in the exercise of this power he "should be careful not to invade the legitimate province of the jury, when they have manifested a fair and intelligent consideration of the evidence submitted to them." (*Solen* v. *V. & T. R. R. Co.*, 13 Nev. 135.)   The district court "ought not to grant a new trial when there is conflicting evidence, except the weight of evidence clearly preponderates against the verdict."   If the district court grants a new trial upon this ground, "the appellate court will not interfere, unless the weight of evidence clearly preponderates against the ruling of the district court." (*Treadway* v. *Wilder*, 9 Nev. 70.)

With these well-settled principles we will proceed to review such portions of the evidence as is deemed necessary for a

determination of the question under consideration. It is admitted that the ore does not work as high as the assays; that the assay value of the ore is not the true value; that silver is assayed "at the rate of one dollar and twenty-nine cents, an arbitrary standard, although the actual value of silver is very much below that." The answer denies the quantity and value of the ore as alleged in the complaint; but admits that the defendant dug down, mined, and removed from the mining ground two thousand one hundred tons of ore of the value of four dollars per ton, and that said mining claim was thereby damaged in the sum of eight thousand four hundred dollars, and that other damage was committed, as alleged in the complaint, to the extent of five hundred dollars. The ore was taken from different places in the mine, designated by the witness as ore-body B, Southeast Upraise, Fire Drift, Gooseneck, Fort Probert, Leadville, and Jumbo Cave; the greatest quantity being taken from ore-body B. "All the ore taken out by the Richmond Company," says the witness Wescoatt, "was between December, 1879, and December, 1881, except Jumbo Cave. The ore was taken from Jumbo Cave in the summer or fall of 1882." There is a variance in the testimony of the respective witnesses as to the proportion of waste to be deducted from the amount extracted. For the purpose of this opinion, we shall adopt, without discussion, the evidence as offered by appellant, that from the gross amount there should be deducted one third for waste, and fourteen per cent for moisture.

*Ore-body B.* Testimony upon the part of respondent: E. N. Robinson, who is a civil and mining engineer and surveyor, and was superintendent of respondent's mine, testified that there had been six thousand and sixty-nine tons of ore taken out by the Richmond Company, of the value of sixty dollars per ton gold and silver, and twenty-six per cent lead. N. Wescoatt, who is a civil and mining engineer and surveyor, and who was in the employ of the Richmond Company from 1877 to 1882, and was assistant superintendent of the mine during the last three years of his employment, testified that he was "very familiar with the ore taken from ore-body B. * * * I think it would average from fifty to fifty-five dollars in gold and silver, and a considerable percentage in lead." Thomas J. Reed, a civil engineer and superintendent of mines, estimates

the value at from fifty to sixty dollars per ton.  J. N. Williams, who has been a foreman in the mine of the Albion Company, and was well acquainted with the character of this ore, testified that from his experience as a miner the ore taken out " would average fifty dollars per ton; it was a good grade of ore."   Other testimony was offered tending to show that the value of this ore was from fifty to sixty dollars per ton

Testimony upon the part of appellant: R. Rickard, who was the superintendent of the Richmond Company when the ore was extracted and removed, testified that he had " a good idea of the quality of all the ore taken out by the Richmond Company west of the A C line.  I think it would assay in gold and silver about thirty-five dollars or forty dollars per ton; that is, the ore taken from ore-body B "; that " the grade of Richmond ores smelted was about fifty dollars on an average.  We have lots of ore from the Richmond mine of a higher grade than ore-body B "; that " the average assay of ore from the Richmond mine is from forty-five dollars to fifty-five dollars per ton.   Ore-bodies vary considerably; generally lower grade near the edges.  I think thirty-five dollars to forty dollars a fair average "; that " the profit on thirty-five-dollar ore was two dollars and ninety-eight cents per ton, and the average of thirty-five-dollar and forty-dollar ore was five dollars and twelve cents per ton.  I made a mistake; it is three dollars and sixty-one cents per ton."   He then made the following calculation: " Take one hundred tons of ore of the value of thirty-five dollars per ton, twenty-three dollars silver and twelve dollars gold, contains one thousand seven hundred and seventy-eight ounces of silver and fifty-eight ounces of gold, and twenty-five tons of lead; after deducting smelting losses leaves one thousand six hundred and thirty-five and seventy-six one-hundredths ounces of silver, fifty-one and four one-hundredths ounces of gold, and twenty-one and twenty-five one-hundredths tons of lead.  Value of the lead at New York prices, one thousand seven hundred and forty-nine dollars and ninety-three cents; silver, one thousand seven hundred and thirteen dollars and five cents; gold, one thousand one hundred and twelve dollars and fifty-eight cents; total, four thousand four hundred and seventy-five dollars and fifty-six cents; further deductions, freight, thirty dollars and fifty-seven cents per

ton to San Francisco on the total weight, separating, thirty-five dollars per ton, equals sixty-five dollars and fifty-seven cents per ton; deductions, one thousand three hundred and thirty-six dollars and ninety-three cents, and commissions, forty-four dollars and seventy-five cents; total, one thousand four hundred and thirty-eight dollars and eleven cents. Total value net crude bullion, three thousand thirty-seven dollars and forty-five cents, or thirty dollars and thirty-seven cents per ton; mining and smelting, twenty-four dollars and ninety-four cents per ton; deduct from the net yield, leaves five dollars and forty-three cents per ton net profit on thirty-five-dollar ore."

Upon his cross-examination he testified that the market value of fifty-dollar ore would be twenty-four dollars and eighty-five cents per ton; of fifty-five-dollar ore it would be twenty-eight dollars and seventy-two cents; and of sixty-dollar ore it would be thirty-two dollars and twenty cents. Upon redirect examination he testified as follows: "I stated yesterday that the market value of ore that assayed fifty dollars per ton was twenty-four dollars and ninety-eight cents; twenty-seven per cent lead, deductions for mining and transporting, nine dollars and thirty-six cents, leaves fifteen dollars and sixty-two cents, which is the market value of fifty-dollar ore. Forty-dollar ore, with the deductions, eight dollars and fifty-three cents per ton, and thirty-five-dollar-per-ton ore, with the deductions, would leave five dollars and five cents per ton as the market value."

In relation to the amount of ore taken out, he testified as follows: "I have heard the testimony in relation to the sets of timber in ore-body B. I have heard it stated that there were two hundred and seventy-two sets of timbers taken out by the Richmond Company. As I calculate it, fifteen cubic feet of ore to the ton, there would be in ore-body B three thousand four hundred and twenty-seven tons. After deducting one third for waste, there would be two thousand two hundred and eighty-five tons; after deducting fourteen per cent for moisture, there would be one thousand nine hundred and sixty-five tons; there would be a still further reduction if all the sets were not full sets."

Testimony was offered by appellant to show that the sets of timber in ore-body B were not full sets, and it is claimed that a

still further reduction of the number of tons testified to by Mr.
Rickard should be made upon this account.    The numbers of
the timber sets were taken from the testimony of Mr. Wescoatt,
who testified that while in the employ of the Richmond Com-
pany he " went into that portion of the mine whenever it was
necessary to survey for the sets of timbers.    I went into the
mine once or twice a month and made a record of all the sets
I could find.    I had charge of the underground workings."
Appellant introduced a letter from Mr. Wescoatt, written on
the eighteenth day of January, 1885, in reply to a letter from
Mr. Rickard, in which he stated that in the summer of 1882 he
spent several months compiling maps for the geological survey
of Eureka district, and that during this time he made a  hori-
zontal sectional map ''showing all the timber sets that had been
put in the Richmond ground " between certain points, and that
·"this map showed that the Richmond Company had taken out
about three hundred sets of timbers N. W. of said A C line."
Mr. Wescoatt, upon being called in rebuttal, testified as
·follows: " I meant just what I said in the letter.    It did not
refer to ore taken where there was no timber sets put in.    In
the estimate, two hundred and seventy-two sets that absolutely
existed; then I reduced the Gooseneck, made twenty-four sets,
and five sets from the thirteenth, made three hundred and one
sets.    There was ore taken from other points—Fire Drift, Fort
Probert, and end of Albion main level, Jumbo Cave, and some
other places, of which I had no means of estimating.  In count-
ing the timber sets, reduced them to full sets; made three hun-
dred and one full sets; didn't count the parts of sets as full
sets."

This testimony, although severely criticised and commented
upon by appellant's counsel, is not contradicted.    Appellant's
witnesses all testified that the sets of timbers were not full sets;
but none of them said that if reduced to full sets there would
not be three hundred and one full sets.    They did not give, or
pretend to give, the number of sets, independent of Wescoatt's
testimony, but simply stated that the sets of Richmond timbers
were not full sets.    Returning to the question of the value of
the ore, the statement shows the following estimates, made by
practical miners in the employ of the Richmond Company:
Thos. J. Pearce: " I should judge that the ore in ore-body B
would assay from thirty-five to forty dollars per ton." John G.

Jury: "I think ore body B would assay on the whole about forty dollars per ton." S. Longley, a foreman in the mine: "I worked in ore-body B two months. * * * I am well acquainted with the ore in the Richmond mine. I can generally estimate about what the ore will assay. I think that ore would assay in the neighborhood of forty dollars per ton in gold and silver. I think that would be a good average."

*Southeast Upraise.* Respondent's testimony: Robinson testified "that there was seven hundred and ninety-three tons of ore in that ore-body." Appellant's testimony: Rickard testified that the upper part of this ore-body "was taken out by the Richmond; there was five hundred and twenty tons in that"; after deducting waste and moisture, "there would be two hundred and ninety-eight tons net."

*Fire Drift.* Respondent's testimony: Robinson testified that the ore was extracted from this place in August, 1880; he estimated the amount at three hundred tons, and thought it "would assay up to eighty dollars per ton and thirty per cent lead." Appellant's testimony: Rickard said: "I know the place called Fire Drift. We took out a few sets there. I expect it is correctly represented here on the model—about three hundred tons. After deducting one third waste and fourteen per cent moisture, there would be one hundred and seventy-two tons."

*Gooseneck.* Respondent's testimony: Wescoatt testified that "the ore from the Gooseneck was taken out some time in the early part of 1881." Robinson estimates the amount at four hundred and ninety-five tons. Appellant's testimony: Rickard testified as follows: "In the Gooseneck, the Richmond took out two hundred and fifty-six tons gross; after deducting one third for waste and fourteen per cent for moisture, there would be one hundred and forty-three tons." W. J. Retallick, upon his cross-examination, said that the ore in Gooseneck "was pretty rich; would assay from sixty to seventy dollars per ton." Lew. Dunkel: "I think the ore in the Gooseneck would assay forty or fifty dollars per ton."

*Fort Probert.* Respondent's testimony: Robinson estimated the amount of ore taken out by the Richmond Company at six hundred and fifteen tons, and said: "The ore in Fort Probert was very high-grade ore; the remnants of the ore that was left was very high-grade ore; went high; seventy-five dollars per

ton in gold and silver. I do not remember about the lead in that." Appellant's testimony: Rickard testified that "Fort Probert was a natural cave. I don't think we ever took any ore out of there." Upon his cross-examination he said: "I don't think the Richmond took out any ore from what is called Fort Probert. My recollection is, none taken out. I may be mistaken about that. My impression is, though, there was none taken out; would n't swear one way or the other." Longley said: "We took some ore out down at thirteenth chamber; I think from Fort Probert about two hundred tons. It was taken out in 1880." Making the deduction for waste and moisture, as in the other ore-bodies, would leave the amount one hundred and five and one third tons.

*Leadville.* Respondent's testimony: Robinson estimates the amount of ore taken out at six hundred and thirty-five tons, and states its value at "fifty dollars per ton and fifty per cent lead." There is some confusion as to the dates when this ore was removed. Wescoatt testified that the Richmond Company took the ore in the "latter part of 1879–1880; * * * November or December, 1879. * * * We struck Leadville in November, 1879, and it was taken out in December." Upon his cross-examination he said: "The body of ore in Leadville was discovered in November, 1879, and we started to take it out in December. I think there had been but a few sets taken out by December 26 (29), 1879. It was all taken out by May, 1880." Appellant's testimony: Rickard testified that "Leadville was not taken out by us." Upon his cross-examination he said: "I don't think Leadville was taken out by us. I swear it was not taken out by us." Longley said: "I cannot recollect definitely how much ore was taken out of there. I think about one hundred and fifty tons." Reducing this amount as in other ore-bodies by deducting the waste and moisture would make seventy-nine tons net.

*Jumbo Cave.* Robinson testified that one hundred and thirty-six tons of ore were "taken out by the Richmond Company" from this place; but as there is no positive testimony that this ore was taken out before the twenty-seventh of May, 1882, within the time alleged in the complaint, we exclude it

The foregoing is a fair synopsis of the testimony with reference to the particular ore-bodies. There is a great deal of testimony in the statement on appeal as to the working of

similar ore from the same ore-bodies by the respondent; the samples of ore assayed; the number of cubic feet of ore to make a ton; the size and dimensions of the timbers used in the mine; and other matters tending more or less to corroborate the claims of the respective parties as to the amount and value of the ore. No separate account was kept by the Richmond Company of the number of tons of ore, or of its value, removed and smelted by it from the ground west of the A C line.

The testimony introduced by respondent tended to show that the ore in ore-body B was of greater value than the ore in other parts of the mine, and that the ore from this place was mixed with ore from other places by the Richmond Company in order to reduce its value. Wescoatt testified that the ore taken out from ore-body B "was mixed in the chutes and run into the cars and went down to the furnaces with ores from other parts of the mine," and that the Richmond Company was "in the habit of taking ore from ore-body B at that time and mixing it with ore of lower grade from other parts of the Richmond mine, to make it of an average value."

The testimony offered upon the part of appellant tended to show that the ore from this ore-body was of a less grade than the ore from other parts of the mine. Longley testified that the Richmond Company "mixed other ore from different parts of the mine with the ore from ore-body B, to raise the grade of ore-body B."

There was also general testimony given by Mr. Rickard as follows: "Three hundred sets of timbers will represent the whole amount taken out by the Richmond Company, including waste; two thousand one hundred and fifty tons in all taken out by the Richmond Company west of the A C line." Upon his redirect examination he said: "In my judgment there was two thousand one hundred and fifty tons of ore taken out by the Richmond Company west of the A C line, from the Albion ground. I don't know whether there was any taken from Fort Probert or not. The value of the ore taken was about forty dollars, assay value, per ton."

Taking the amounts given by him in each of the ore-bodies, we have in ore-body B one thousand nine hundred and sixty-five tons; Southeast Upraise, two hundred and ninety-eight tons; Fire Drift, one hundred and seventy-two tons; Gooseneck, one hundred and forty-three tons; a total of two thousand five

hundred and seventy-eight tons; add to this, as testified by
Longley, one hundred and five and one third tons from Fort
Probert, and seventy-nine tons from Leadville, and we have a
total of two thousand seven hundred and sixty-two and one
third tons, as testified to by appellant's witnesses.    From this,
perhaps, there should be deducted say fifty tons (which is a
very liberal estimate), for the amount of ore taken from Lead-
ville prior to the twenty-ninth of December, 1879.    This would
leave a total of two thousand seven hundred and twelve and
one third tons net.    The testimony upon the part of respondent
makes about nine thousand tons gross.    The deductions for
waste and moisture claimed by appellant would leave the
amount over four thousand five hundred tons net.    Estimating
the amount of ore and the value upon the testimony of re-
spondent's witnesses, we have many thousands of dollars more
than the amount found by the jury.    Estimating the net amount
of ore at two thousand seven hundred and twelve and one
third tons, as testified to by appellant's witnesses, and its value at
forty dollars per ton, as testified to by some of the witnesses for
appellant, and the market value at eight dollars and fifty-three
cents per ton, as testified to by Mr. Rickard, we have the sum of
twenty-three thousand one hundred and thirty-six dollars and
twenty cents; adding the admitted damages of five hundred dol-
lars, and legal interest for three years, would make a total of thirty
thousand seven hundred and twenty-seven dollars and six cents,
which is seventeen thousand four hundred and seventy-seven
dollars and six cents more than the verdict of the jury.    Even
estimating it at thirty-five dollars per ton, the lowest amount
named by any witness, and the market value at five dollars and
five cents, which is the lowest amount named by Rickard in
connection with any of his calculations as to the expenses of
reducing the ore, and deductions to be made from the assay
value, we have the amount of thirteen thousand six hundred
and ninety-seven dollars and twenty-eight cents; with damages
and legal interest added as above, it amounts to eighteen thou-
sand four hundred and fifty-six dollars and forty-six cents,
which is five thousand two hundred and six dollars and forty-
six cents in excess of the amount found by the jury.

These conclusions render it unnecessary to consider whether
the district judge, by his criticisms upon the appellant's wit-
nesses in granting a new trial, exhibited any passion or preju-

dice; or whether from the testimony it is made to appear that appellant acted innocently and in good faith in removing the ore, or was guilty of such culpable negligence as to make it liable for the gross value of the ore, and some other minor questions argued by counsel.

The verdict of the jury cannot be sustained upon any impartial, rational, or intelligent consideration of the evidence as set forth in the statement on appeal.

The order of the district court granting a new trial is affirmed.