[No. 2313]

# FRANK LOVE AND MARTIN EVENSEN, RESPONDENTS, v. MT. ODDIE UNITED MINES COMPANY (A CORPORATION), APPELLANT.

[181 Pac. 133 ; 184 Pac. 921]

1. APPEAL AND ERROR—EXCEPTIONS—CERTIFICATE.

A trial court's certificate that statement and bill of exceptions contains all material evidence, except documentary evidence, is insufficient to authorize review of evidence, which will be presumed to support findings and judgment.

## ON REHEARING

1. MINES AND MINERALS—QUESTION OF FACT WHETHER WORK DONE IMPROVED CLAIMS.

It is purely a question of fact whether or not development work done in a particular shaft by the locator of claims so tended to improve the entire group of claims as to prevent forfeiture thereof.

2. APPEAL AND ERROR — REVERSAL IN EQUITY FOR ERRONEOUS INSTRUCTION.

In equity cases, a judgment will not be reversed because of an erroneous instruction.

3. MINES AND MINERALS—IMPROVEMENT WORK ON SINGLE LOCATION DEVELOPING ENTIRE GROUP.

Improvement work within the meaning of the federal statute as to the location of mining claims, is deemed to have been performed, whether the claim consists of one location or several, when in fact the labor is performed or the improvements are made for the development of the whole claim, that is, to facilitate the extraction of metals, though the labor and improvements may be on ground originally part of only one of the locations, and it is not necessary that the work "manifestly" tend to the development of all the claims in the group; "manifest" meaning evident or obvious to the mind.

4. MINES AND MINERALS—DEVELOPMENT WORK ON GROUP OF CLAIMS.

In the exercise of judgment as to where development work should be done on a group of mining claims and locations, a wide latitude should be allowed the owners of the property.

5. MINES AND MINERALS—EVIDENCE NOT SHOWING DEVELOPMENT WORK INSUFFICIENT.

In an action to quiet title to a group of eight mining claims, wherein verdict was rendered in favor of plaintiff relocators for four of the claims, evidence that the development work done in one place by defendant company on such claims was insufficient to prevent forfeiture held not such as to sustain the judgment.

6. TRIAL—VIEW OF PREMISES BY COURT.
    A view of the premises involved in mining litigation cannot be considered as evidence, but only to enable the court better to understand and comprehend the evidence introduced and intelligently to apply it.

APPEAL from Fifth Judicial District Court, Nye County; *Mark R. Averill,* Judge.

Action to quiet title to mining claims. Judgment for plaintiffs, and defendant appeals. **Affirmed.**

On rehearing, **judgment reversed.**

*H. R. Cooke,* for Appellant:

The record affirmatively shows, as the trial judge, whose duty it was to settle and allow the bill, certifies, that it contains "all of the evidence admitted at said trial (with the exception of documentary evidence, which was separately certified) material and pertinent to the issue." "But, to enable this court to intelligently pass upon the question whether the findings or verdict are sustained by the evidence, it is necessary that it have all of the material evidence before it." Howard v. Winter, 3 Nev. 549; Eaton v. Oregon Ry. Co., 30 Pac. 311. "If it were stated that it contained all the material evidence offered upon the particular facts claimed to be unsupported, the certificate of the judge to the correctness of the statement would of course be sufficient to establish that fact." Sherwood v. Sissa, 5 Nev. 349; Bailey v. Papina, 20 Nev. 177. "A party cannot complain of omission in a bill of exceptions of evidence not material to questions considered on appeal." Denver & R. G. Co. v. Andrews, 53 Pac. 518. The terms "settling," "allowing," etc., presuppose a discretion in the trial court as to what and how much of the evidence is material and should be contained in the bill. 2 C. J. 1156.

*Norcross, Thatcher & Woodburn,* for Respondent:

The court should not inquire at all into the evidence in this proceeding, for the reason that no valid motion for

a new trial was ever made, and because the bill of exceptions shows affirmatively that it does not contain all the evidence. The functions of the jury were advisory, and did not constitute a verdict or decision. State ex rel. Equitable G. M. Co. v. Murphy, 29 Nev. 247. The notice of intention to move for a new trial should have been directed against the decision of the court. Idem. No valid motion for a new trial having been made, this court may not consider the insufficiency of the evidence to justify the decision of the court. Rev. Laws, 5328; Street v. Lemmon M. Co., 9 Nev. 251.

The bill of exceptions does not show affirmatively that it contains all the evidence. The certificate of the official reporter shows that the testimony transcribed is "a full, true and correct transcription of certain designated testimony." This is not cured by the purported certificate of the district judge. To entitle one to review the sufficiency of the evidence to justify the verdict or decision, the statement or record or bill of exceptions must contain all of the evidence. Howard v. Winters, 3 Nev. 541; Sherwood v. Sissa, 5 Nev. 353; Bowker v. Goodwin, 7 Nev. 137; Libby v. Dalton, 9 Nev. 23. The appellate court will presume that every fact essential to sustain the judgment, order or decision was fully proven. "Such rulings are based upon the presumption that all intendments being in favor of the verdict, the omitted evidence would sustain it." Libby v. Dalton, supra.

By the Court, COLEMAN, C. J.:

This is an action to quiet title to certain mining claims. Judgment was rendered in favor of the plaintiffs, from which, and from an order denying motion for a new trial, an appeal has been taken.

Counsel for respondent object to our considering the merits of the case, for the reason that the bill of exceptions does not contain all of the evidence material and essential to a correct determination thereof.

Before proceeding further, it may not be out of place to say that at different stages of the proceedings in the lower court, including the preparation of the record upon this appeal, three attorneys who are not now connected with the case participated at different times in its management.

We think the objection urged to a consideration of the case upon its merits is well taken. The bill of exceptions contains only about 1½ typewritten pages of the direct testimony of the witness Love, who testified on behalf of plaintiffs, and is confined solely to that portion of his testimony showing his experience as a prospector and miner. It does not contain one word of testimony given by the witness mentioned on direct examination concerning the material and vital issue in the case, but it does contain about 25 pages of his cross-examination upon the vital issue. The bill of exceptions is in substantially the same condition as to the testimony of the witness Evensen.

Following the first 36 pages of the testimony contained in the so-called "statement on appeal and bill of exceptions" is found a statement by the court reporter as follows:

"I hereby certify that I am the duly appointed, qualified, and acting official reporter of the district court of the Fifth judicial district of the State of Nevada, in and for the county of Nye; that I acted as official reporter upon the trial of the above-named cause, and that at such trial I took verbatim shorthand notes of all testimony and proceedings given and had; that the foregoing 36 pages constitute a partial transcription of said shorthand notes, and, so far as this particular portion of the testimony goes, is a correct statement thereof."

On page 205 of the statement is found another certificate of the court reporter, which we quote:

."I hereby certify that I am the duly appointed, qualified and acting official reporter of the district court of the Fifth judicial district of the State of Nevada, in and for the county of Nye; and that I acted as such official

reporter upon the trial of the above-named cause, and that at such trial I took verbatim shorthand notes of all testimony and proceedings given and had; that the foregoing is a full, true, and correct transcription of certain designated testimony, and is in all respects a full, true, and correct statement of said designated testimony and proceedings given and had at such trial."

The certificate of the trial judge is as follows:

"I, the undersigned, the judge who tried said action, do hereby certify that the foregoing statement on appeal and bill of exceptions has on due notice been settled and allowed by me, and the same is correct, and that it contains a full, true and correct transcription of all of the proceedings upon the trial of said cause and of all the evidence admitted at said trial (with the exception of documentary evidence) material and pertinent to the issue of whether the work on the Verner and on the New York claim was of such a character that the same tended to develop the adjoining claims and which were in controversy between plaintiffs and defendants in this case."

It will be seen from the two certificates of the official reporter that the purported transcript is but a partial transcript of the evidence, while the certificate of the trial judge shows that the statement and bill of exceptions is a correct transcript of all of the evidence admitted at the trial and pertinent to the issues, with the exception of documentary evidence. We do not feel that it is necessary that we determine whether or not the bill of exceptions shows upon its face that all of the material evidence given on direct examination of the witnesses Love and Evensen is not embodied therein. We are clearly of the opinion, however, that the certificate of the trial judge does not show that all of the evidence material to the issue presented upon this appeal is contained in the bill of exceptions, as contended by counsel for appellant, who relies upon the rule laid down in the case of Bailey v. Papina, 20 Nev. 177, 19 Pac. 33. Eliminating from consideration the certificates

of the court reporter, which are not necessary at all, it appears from the certificate of the trial judge that documentary evidence material to the issues is not embodied in the statement and bill of exceptions. This being true, we cannot consider the evidence at all, and it must be presumed that the findings and judgment are supported by the evidence. Gammans v. Roussell, 14 Nev. 171; County of White Pine v. Herrick, 19 Nev. 311, 10 Pac. 215; Bailey v. Papina, 20 Nev. 177, 19 Pac. 33.

It may be asked: What documentary evidence could possibly exist which could have aided the trial court in arriving at a conclusion as to the real question of fact involved in the case? Of course, we need not determine that question, though we think it possible that there might have been reports of mining engineers, or signed statements impeaching the testimony of some, or all, of the witnesses who testified in behalf of appellant. Suffice is to say that, since it appears that there was documentary evidence material to the issue, which is not embodied in the bill of exceptions, we could only speculate as to its character and weight, which we are not called upon to do.

Since it is not contended that any error appears from the judgment roll, it follows that the judgment appealed from must be affirmed; and it is so ordered.

## ON REHEARING

By the Court, COLEMAN, C. J.:

This is an action to quiet title to a group of eight mining claims. The complaint is in the usual form. The case was tried before a jury. Verdict was rendered in favor of the plaintiffs for four of the claims. From an order denying a motion for a new trial and from the judgment, an appeal has been taken.

Prior to January, 1911, defendant was the undisputed owner of the ground in question consisting of a group of eight claims, under and by virtue of its location as mining claims and a compliance with the laws, rules, and regulations pertaining thereto. On July 25, 1913,

plaintiffs, asserting that the labor for the year 1912 had not been done upon the claims by the defendant company, entered upon and located them. It is admitted by plaintiffs that the defendant company did enough work on one of the claims (the Verner) to constitute the labor upon said group, if such work can be considered, but contend that the work done at that point did not tend to develop the group.

1. It is agreed between counsel that it is purely a question of fact as to whether or not the work done in the Verner shaft in 1912 so tended to improve the entire group of claims as to prevent a forfeiture thereof; and such is the law. Big Three M. & M. Co. v. Hamilton, 157 Cal. 130, 107 Pac. 304, 137 Am. St. Rep. 118.

2, 3. Before proceeding to consider the main question of the case, we will dispose of the error assigned to the giving of that portion of plaintiffs' instruction No. 4, wherein the court told the jury that where work is done upon one claim for the benefit of an entire group, it "must manifestly tend" to the development of all the claims in the group. It is a general rule that in equity cases a judgment will not be reversed because of an erroneous instruction. We might dispose of this phase of the question without saying more; but, in view of the fact that the learned trial judge in his written opinion holds that such is the law, and was evidently controlled by that view of the law in reaching his conclusion, we deem it proper to express our interpretation of the law for the guidance of the courts in the future.

The trial judge, in his written decision, cited section 630 of Lindley on Mines in support of his views. He no doubt accepted the statement of Mr. Lindley without having examined the authorities cited by that eminent author in support of the text, as was most natural, in view of the arduous labors incident to his position; and, while we entertain great deference for the views of Mr. Lindley, we cannot accept his statement of the law. We have examined the decisions of the various courts cited, and do not find that they support the author; nor do

we see how such a view can be sustained. The word "manifest" means "evident to the senses; evident to the mind; obvious to the mind." Webster's Int. Dict. The courts uniformly hold that annual labor may be done outside of a claim, or group of claims, upon a patented mining claim, or upon the public domain. Certainly work done outside of a claim, upon a patented mining claim, or upon the public domain, cannot be said to "manifestly" tend to develop such claims; but it is the universal rule that proof may be offered to show that such work was done for the purpose of developing such other claims, and that in fact it tends to develop them, and when so shown it complies with all requirements. If it were the rule that the work "must manifestly" tend to develop a group of claims, work done on the public domain could not count, as by no possible stretch of the imagination could it be said that such work would "manifestly" tend to develop such group, nor could proof cause it to "manifestly" so appear. The correct rule to apply to the situation here presented is declared by the Supreme Court of the United States in Smelting Co. v. Kemp, 104 U. S. 636, 26 L. Ed. 875, as follows:

"Labor and improvements, within the meaning of the statute, are deemed to have been had on a mining claim, whether it consists of one location or several, when the labor is performed or the improvements are made for its development, that is, to facilitate the extraction of the metals it may contain, though in fact such labor and improvements may be on ground which originally constituted only one of the locations, as in sinking a shaft, or be at a distance from the claim itself, as where the labor is performed for the turning of a stream, or the introduction of water, or where the improvement consists in the construction of a flume to carry off the debris or waste material."

Whatever other courts may think or say, the law as laid down by the court mentioned upon this question is final, though, so far as we know, all of the courts of the

land are in accord with the view thus expressed, and some of the authorities so holding are Copper Mt. M. & M. Co. v. Butte, etc., 39 Mont. 487, 104 Pac. 540, 133 Am. St. Rep. 595; Chambers v. Harrington, 111 U. S. 350, 4 Sup. Ct. 428, 28 L. Ed. 452; Fredricks v. Klauser, 52 Or. 110, 96 Pac. 679; Big Three M. & M. Co. v. Hamilton, 157 Cal. 130, 107 Pac. 304, 137 Am. St. Rep. 118; Nevada Ex. & M. Co. v. Spriggs, 41 Utah, 171, 124 Pac. 773; Lindley on Mines (3d ed.) sec. 629; Snyder on Mines, sec. 480; Costigan on Mines, p. 278.

4. It may be said that it is the policy of the law to encourage the doing of annual labor on mining claims in a manner which will best develop the property and lead to the discovery of mineral, and for that reason annual labor upon a group of mining claims may be done all in one place, the object of the government being to encourage such development as is most likely to result in the production of the precious minerals; and since depth is usually necessary in the making of a mine, it is much better, as a general rule, to spend $800 in one place than to distribute $800 in eight or more places, provided it is done in an honest effort to make a mine, and in a manner tending to develop all of the claims. And in the exercise of judgment as to where work should be done, we think a wide latitude should be allowed the owners of property, consisting of several claims, as to where the work shall be done to develop a group of claims. And in this view we are sustained by ample authority. In Big Three M. & M. Co. v. Hamilton, supra, it was said:

"Work done on one of a group of mining claims which has a tendency to develop or benefit all of the claims in said group inures to the benefit of each and all of said claims, even though the system adopted may not be the best that could have been devised under the circumstances."

Judge Farrington, in Wailes v. Davies (C. C.) 158 Fed. 667, in determining a case in which the question before us was involved, said:

"The statute does not require  *  *  *  that the work shall be wisely and judiciously done."

See, also, Mann v. Badlong, 129 Cal. 577, 62 Pac. 120.

With these observations in mind, we will consider the evidence in the case, as shown by the bill of exceptions. Only three witnesses were called in behalf of the plaintiffs, viz, the plaintiffs themselves and one McCarthy, and the latter testified in rebuttal only. We reiterate here what we said in our previous opinion:

"The bill of exceptions contains only about 1½ type-written pages of the direct testimony of the witness Love, who testified in behalf of plaintiffs, and is confined solely to that portion of his testimony showing his experience as a prospector and miner. It does not contain one word of testimony given by the witness mentioned on direct examination concerning the material and vital issue in the case, but it does contain about 25 pages of his cross-examination upon the vital issue. The bill of exceptions is in substantially the same condition as to the testimony of the witness Evensen."

But, notwithstanding this fact, the trial judge denied a motion for nonsuit at the conclusion of plaintiffs' testimony in chief.

There being no evidence in the record on direct examination for us to consider, tending to sustain the judgment, we are confined to the cross-examination, replete with asterisks, as it is. From the cross-examination of plaintiffs Love we quote the following extracts:

"Mr. Cooke: Q.  *  *  *  All right. Then, if you were not concerned in that land, not interested in it, made no examination of the shaft or the character of the work that was done there, why do you say, as you did say a while ago, that that shaft did not benefit the Daisy and the Jackie ground so as to prevent Evensen from relocating it?  *  *  *  A. I didn't think it was; where it is situated in the northwest corner there, I can't see how it can benefit them..

"Q. Is that the best answer you have to that question? A. Well, it is the best I know.

"Q. Well, of course that is all you can say, is what you know. That is the best answer you can make, is it? A. (Witness hesitates.)

"Q. You have no further answer to make to that? A. No full answer?

"Q. No further, I say. A. I don't understand you.

"Q. I want to give you an opportunity to answer that if you want to now, if you have any further answer to make; if not, we will proceed with something else.

"Mr. Sanders: I think that is enough.

"Mr. Cooke: Well, if you are satisfied, I am.

"Mr. Sanders: Well, let us go on with something else.   *   *   *

"Mr. Cooke: Q.   *   *   *   That shaft, so far as you know, was within the lines of the Verner claim, wasn't it? A. It was, but pretty near the Halifax.

"Q. Well, what has that got to do with it? A. Well, it shows that it wasn't in a place to develop that group of ground.

"Q. What is the reason you jumped the Verner claim when there was $300 worth of work at least done there during that year? A. Because I couldn't see what there was hardly benefiting any claim; I can't see where it benefited more than one-half of the Verner.

"Q. Not even the claim on which the shaft was sunk? A. Well, it didn't look to me that way; that was my purpose of taking it up; I didn't think the work was in the right place; it was a straight shaft, and right near the corner of the Halifax, and I didn't see where it was even benefiting one claim.

"Q. It didn't even develop the Verner? A. Well, that is my idea.

"Mr. Cooke: Q. Do you undertake to say, Mr. Love, that sinking that shaft fifty feet deep on the Verner claim didn't tend to develop that claim? A. The way it is I can't see where it did; I never could get it into my head where it did.

"Q. Do you say as a miner that the sinking of a fifty-foot shaft on that claim didn't tend to develop it? A. I

say it didn't tend to develop the whole claim; it wasn't put there for that purpose; that is my idea of it.

"Q. Did it tend to develop that part of the claim on which it was sunk? A. It would do that if they had anything to show; I don't think they have got anything there to show for it.

"Q. Have they got to find mineral in a shaft before it tends to develop the claim? A. No.

"Q. What do you mean then to show in it? A. Want them to put the work in the proper place for to develop the group, if they are trying to hold it for the group.

"Q. Well, but couldn't they hold the Verner claim, which you jumped, couldn't they hold that whether they could hold the others or not, with that fifty-foot shaft? A. My idea is that they could not.

"Q. Then, Mr. Love, with your experience as a miner, the sinking of a fifty-foot shaft upon a claim, in the rock, and timbering it up, doesn't tend to develop the claim? A. Just as I told you, I can't see where it can— the whole of the claim.

"Q. Well, put it that way, because they made a show, and still spent at least $300 in sinking a shaft on the Verner claim, that you admit was within the lines of the Verner claim, that they ought to suffer the loss of that claim, and you ought to take it—is that your position? A. Yes.

"Q. Now, Mr. Love, coming back to this Verner: There was a shaft put in there, and there were timbers put in there. Now, you say the shaft didn't count for anything because in your judgment it wasn't located in the right place and it didn't tend to develop the ground. Now, then, building a building upon a mining claim tends to develop the ground, doesn't it, isn't that good as annual labor? A. It does as far as it goes.

"Q. How far does this blacksmith shop go? A. Oh, I couldn't tell you. It don't go very far.

"Q. If you couldn't tell, what business had you to jump the ground? A. It couldn't amount to a great deal to hold that whole group, that I know.

"Q. Well, if it held one claim, what right did you have to locate that claim on which the blacksmith shop was located? A. I located it because I did not think the work was done in good faith.

"Q. You then assume to be the judge of the good faith of the work done, and if you conclude that it isn't done in good faith you would go and jump any property, no matter if there was $10,000 worth of work done on it? Is that your style of doing business. A. No, it ain't.

"Q. Well, it was your style in this case, wasn't it, Mr. Love? A. It wasn't for that purpose.

"Q. Well, did you assume to judge about the good faith because this wasn't located in the place where you thought it ought to be, notwithstanding that it was a number of times in excess of the required amount of expenditure for one claim on which these improvements were placed, didn't you? A. I located it because it wasn't done in the right place for good faith; it wasn't located for development; that is why I took it.

"Q. Now, if the work actually does tend to show the presence or the likelihood of the presence of ore in the ground, isn't it annual work, even though it is done with the idea of making a showing? A. It shows the way— that is, to me—and I can't get it any other way; it is not showing good faith, putting it in that corner.

"Q. Then why, when you now admit that the work did benefit the Verner, you now admit it was worth $300, why did you relocate the Verner? A. Because, just where the shaft was I didn't think that it was right to develop it.

"Q. It wasn't the right place to put it?     *     *     *

"Q. Well, if you have two claims adjoining each other, and I wanted to do the work on the two of them—on one of them for the benefit of both, and I sink a shaft in the corner of one of them at a cost of $175, is it your understanding that you could jump both of these claims because $175 wasn't sufficient to include both, and because I had put my shaft in a corner instead of the middle? A. No, if one benefits the other.

"Q. Well, how about the claim on which the shaft is sunk, can I hold that whether I can hold the other one or not? A. Well, yes, you can hold that one.

"Q. Yes. Then why could not the Mount Oddie United Mines Company in this case hold the Verner? A. Because it wasn't done from a good intention.

"Q. Was the Little Billie developed to any extent, or benefited to any extent by the sinking of that shaft in the northwest corner of the Verner? A. I can't see that it was.

"Q. You can't see it. That is all the reason you know of, Mr. Love, that you just can't see it? A. I can't see it that way.

"Q. You know of no other reasons? A. That is all the reasons I have. It don't look possible to me.

"Q. It don't look possible to you that a shaft sunk in the rock 50 feet deep could develop more than 700 feet away? A. No, it don't."

The following extracts we take from the testimony of plaintiff Evensen:

"Mr. Cooke: Q. * * * Well, if the Verner shaft, sunk in 1912, which was worth approximately $300 to sink, and a blacksmith shop was put up there at the valuation you have given us, and the concrete work was done there, and the shaft was timbered, on what grounds do you claim in this case that the Verner was open for relocation in July, 1913? A. It don't develop any group —that shaft.

"Q. Don't develop any group? A. No.

"Q. Because it didn't develop the group that left the Verner open to relocation, is that the proposition? A. Yes; don't see to develop even the Verner.

"Q. Now, right there: Do you say, as a mining man of such experience as you have had, that the sinking of that shaft in the Verner claim did not tend to develop the Verner claim? Just cut out these other claims for the time being. A. No. * * * Well, I don't know. I ain't much of a mining man myself, so far as mining expert or anything. * * *

"Q. Well, if you don't know anything about it, why do you say that this work didn't tend to develop the Verner claim?   A. Well, that is what I say, I don't know.

"Q. Well, if you don't know, why do you say that a shaft fifty feet wouldn't develop it?   A. Well, I suppose a lawyer ought to know it.

"Q. Just answer the question.   A. Well, I got the information from a lawyer, that that shaft didn't develop that group.   I went to him and asked him first.

"Q. Asked him if it developed it?   A. Yes.

"Q. And you relied upon that rather than your own judgment, in making the relocation.   A. Why, sure I did.

"Q. Did Love do the same thing?   A. I think he did.
*   *   *

"Mr. Cooke:   Q. Then you didn't know anything about what the effect of sinking a shaft on one claim is, with reference to its developing adjoining claims?   *   *   *   A. I don't know."

5. Such is the testimony on cross-examination, as it appears from the bill of exceptions, upon which we must sustain the judgment, if it is to be sustained at all.   Notwithstanding the rule that an appellate court is reluctant to reverse a judgment of a trial court purely upon the ground that the evidence does not sustain the judgment, we do not find that this is such a case.   The evidence in favor of respondents, as presented to us, consists of nothing but conclusions.   There is not a statement of a fact contained in the bill of exceptions worthy of serious consideration, and the testimony of the plaintiff Evensen shows that his conclusion as to the sufficiency of the work was based solely upon the opinion of his attorney.   He said that he did not know whether or not the work would tend to develop the entire group.   His testimony is worthless.

To permit a judgment to stand upon such evidence would be to make a farce of judicial proceedings; to substitute conclusions of interested parties for facts.

Defendant called eight or ten disinterested witnesses, some of whom were men of technical training and wide experience as mining operators in the Tonopah District, who gave testimony to the effect that the shaft in question was sunk in the proper place to develop the group of claims. In behalf of the defendant company, evidence was given that at a meeting of the officers and board of directors the question of doing the annual labor for all of the claims at the point at which it was done was considered, and the advantages thereof, and it was decided to adopt that plan for the development of. the group of claims, and the work was done accordingly. In the face of the record, we are clearly of the opinion that the judgment of the lower court should have been in favor of the defendant company.

There is no substantial evidence in the record to sustain the judgment. The undisputed evidence shows that more than enough work was done for the entire group. If mining claims can be forfeited upon such testimony as that before us, development of mining ground when several claims are held in a group will be greatly retarded, to the disadvantage of the industry, of a mining district, and of the state. In this connection, we quote with approval the language of the Supreme Court of Wyoming in Sherlock v. Leighton, 9 Wyo. 297, 308, 63 Pac. 580, 583:

"With the single exception of the testimony of the adverse claimant, who expressed as his opinion that the tunnel in no way tended to the benefit of the claim, there is no support in the evidence of the allegations of forfeiture. To hold, upon the strength of his testimony alone, as against all the other facts in the case and the judgment of other experienced miners, that there had been an abandonment or forfeiture, although the locator had, in good faith, made the required expenditure, believing that the work done would inure to the advantage of his claim, and assist in its development, would shock our sense of justice. It would amount to substituting for the honest judgment of the locator the judgment, doubtless equally as honest, of his adversary, who

has sought to get possession of the property by taking advantage of the supposed forfeiture. It seems to us that in determining the question as to the beneficial character of a tunnel such as was constructed in this case, where the opinions of expert witnesses differ upon the question, some force should be given to the honest intention and good faith of the locator, and in a doubtful case that might be sufficient to turn the scale. But, according to most of the witnesses in the case at bar, the work was of benefit, and that opinion appears to us to be supported by the facts in the case. The great weight of the evidence upon the proposition is clearly opposed to the theory of the defendant in error. We regard the conflict, so far as the facts are concerned, as so slight and unimportant that the case does not call for the application of the rule by which an appellate court is guided where a decision upon a question of fact is found to rest upon conflicting evidence. In our judgment, the evidence is insufficient to sustain the allegation of forfeiture of the Cleveland lode."

6. A point is sought to be made of the fact that the court viewed the premises in question. It is the rule in this state that a view cannot be considered as evidence, but only for the purpose of enabling the court to better understand and comprehend the evidence introduced, and to intelligently apply it. Albion M. Co. v. Richmond M. Co., 19 Nev. 225. But if the contrary rule existed, we do not think that, in the face of the record in this case, the view would justify the judgment. As we look upon the record, there is no substantial oral evidence therein in behalf of plaintiffs, and a mere view, considering the nature of the case, is not sufficient to sustain the judgment, and certainly not in the face of the evidence in behalf of appellant.

There being no evidence in the record to sustain the judgment, it is reversed.

[NOTE—SANDERS, J., having been counsel for the plaintiffs in the trial court, did not participate in the consideration of the case.]