## BISHOP *v.* BAISLEY.

[41 Pac. 937.]

1. PLEADING FORFEITURE OF MINING CLAIM.— The defense of a forfeiture of a mining claim through failure to perform the required work thereon is an affirmative defense, and must be specially pleaded where an opportunity is offered for so doing; and the burden of proof is always on the party claiming the forfeiture.

2. AMENDMENT OF PLEADINGS TO CONFORM TO PROOFS — DISCRETION OF COURT.— It is not an abuse of discretion by the trial court to permit at the trial an amendment setting up new defenses based on evidence that was objected to when offered, where the case is sent back to the referee to take such additional testimony as may be offered on the new issues[*]: *Mendenhall* v. *Harrisburg Water Company*, 27 Or. 38, distinguished.

3. PLEADING FORFEITURE IN TERMS.— In pleading under the Code it is only necessary to accurately and concisely state the facts relied upon, and therefore a plea of forfeiture of a mining claim need not aver

[*]In *Cook* v. *Croisan*, 25 Or. 475, it was held reversible error to refuse at the trial, and after counsel had commenced their argument, an amendment to the answer based on evidence that had been received without objection. This, however, was a law action, and the issue raised by the proposed amendment was material and one on which both sides had offered testimony without objection. This case is distinguished in the *Mendenhall Case*, 27 Or. 38.—REPORTER.

specially that in consequence of the facts set forth "the claim was forfeited."

4. MINES—WHAT IS NOT ANNUAL WORK.—Picking rock from the walls of a shaft or outcropping of a ledge, in small quantities, from day to day, and testing it, in order to find a paying vein, cannot be credited as part of the one hundred dollars' worth of "work and improvements" required by Revised Statutes of United States, § 2324, as amended by Supplement to the Revised Statutes of United States, p. 276, to be made by a locator on his claim within one year from the date of his location.

5. KIND OF ASSESSMENT WORK REQUIRED.—The requirement that a certain amount of labor or improvement shall be done or made on a mining claim each year in order to hold it is for the double purpose of insuring good faith in the claimant, and of requiring him to show a really valuable mine before claiming a patent; from which it follows that the kind of work required by the statute (United States Revised Statutes, § 2324, as amended,) is work tending to develop and exhibit the value of the mine rather than work expended in discovery or preliminary exploration.

6. FORFEITED CLAIM—RESUMING WORK.—Where a mining claim has been forfeited by the locator, his afterward going onto the claim with tools, securing samples of the ore, and testing and assaying it is not a resumption of work, within the meaning of section 2324 of the Revised Statutes of the United States as amended in January, eighteen hundred and eighty, providing that a forfeited or abandoned mining claim may be relocated, provided the original claimant has not "resumed work" before the attempted relocation.

7. EQUITY JURISDICTION—INJUNCTION AGAINST TRESPASS.—Equity will interfere by injunction to restrain a continuing trespass on a mining claim by the removal of valuable ores, and to compel an accounting for injuries already inflicted, at the suit of one claiming to be the owner of the realty, though out of possession, where a law action is pending to determine the title, and, if a strong showing is made, the trespass will be enjoined even where no law action has yet been commenced. Ordinarily, the injunction will be only temporary pending the trial of the title, but if the plaintiff presents a *prima facie* possessory title that is not seriously disputed, equity will settle the entire controversy without waiting for any proceedings at law.

APPEAL from Baker: ROBERT EAKIN, Judge.

This suit was brought by Philip R. Bishop against James L. Baisley and others to restrain trespass upon a mining claim, and to recover damages for the injurious use of it by the defendants. The plaintiff, af-

ter showing his citizenship, alleges, in substance, that he is now and was at all times mentioned in his complaint the owner by reason of location and possession under the general mining laws of the United States of a certain quartz mining claim situated in Baker County, Oregon, generally known and designated as the White Pigeon Quartz Claim (then follows a description of the claim by metes and bounds); that on or about the first day of May, eighteen hundred and ninety-three, while he was such owner and in possession of said mining claim, the defendants wrongfully entered and trespassed thereon, and dug a shaft many feet deep upon the vein therein, and at said time, and at various and divers times since, took out, carried away, and converted to their own use, large quantities of very rich gold-bearing quartz, claiming the right so to do, thereby destroying the substance of said mine and depreciating the value thereof, and that they threatened to continue and were continuing said trespass and waste to the irreparable injury of the premises; that the defendants extracted gold from said mine to the value of thirty thousand dollars; that plaintiff has been greatly hindered in the possession and working of said claim to his damage in the sum of fifty thousand dollars; and that he has no plain, speedy, or adequate remedy at law. The relief asked is a decree perpetually enjoining defendants from further trespassing upon said claim, or interfering with plaintiff's possession; that defendants account to plaintiff for the gold extracted by them, and for damages in the sum of fifty thousand dollars. The answer puts in issue every material allegation of the complaint, except the citizenship of defendants, and for a further defense alleges, in substance, that at all the times therein stated the premises therein described were

vacant public lands of the United States, chiefly valuable for the mineral they contained, and were subject to location as mineral lands; that on the first day of May, eighteen hundred and ninety-three, defendant J. L. Baisley made a good and valid location of the "Mabel" quartz claim, in Baker County, Oregon. (Here follows a description of the claim and other allegations as to the manner of its location.) Continuing, the answer shows, substantially, that ever since May first, eighteen hundred and ninety-three, defendants have been and now are the owners of said claim by virtue of location and occupancy, and have at all times been and now are in the open, notorious, exclusive, and actual possession thereof, claiming title thereto. The reply denies specifically the material allegations of the answer, and, further replying thereto, alleges, in substance: That about December twelfth, eighteen hundred and ninety-two, defendants applied to and obtained plaintiff's permission to enter upon the said "White Pigeon" claim, and to prospect the quartz ledge thereon, and that their entry upon said claim was made under said license, with full knowledge of plaintiff's claim and right of possession, and in subordination thereto; that while so in possession they wrongfully and fraudulently attempted to make the alleged location of the Mabel Claim,—which covers plaintiff's claim for a distance of one thousand two hundred and sixty feet from the northeast line thereof,—with intent to defraud plaintiff of his rights; and that by reason of the premises the defendants are estopped from contesting the right of plaintiff to the ownership and possession of said "White Pigeon" mining claim.

Upon the issues being thus joined, a referee was appointed by the court to take the testimony, and to

report his findings of fact and conclusions of law. In due time all the testimony which the parties had to offer was taken, and on June twenty-fifth, eighteen hundred and ninety-four, the referee reported the same, together with his findings of fact and law, which were favorable to plaintiff. On the same day defendants filed a motion for leave to file an amended answer, which was allowed by the court over plaintiff's protest. Defendants thereupon filed an amended answer similar to the first, except that the defendants set up therein the location of an additional claim on May first, eighteen hundred and ninety-three, designated as the "Queen of the West," which covers the remaining two hundred and forty feet of the "White Pigeon" not covered by the "Mabel," and, by way of a further defense, allege, in substance, that neither the plaintiff nor any of his grantors or predecessors in interest did or performed, or caused to be done or performed, any work, labor, or improvements, of any kind, nature, or description, upon or for the use or benefit of said alleged "White Pigeon" claim, under or by virtue of said alleged location of plaintiff; and that plaintiff and his grantors wholly failed and neglected to represent said claim after the date of said alleged location in any manner or form whatever, or to the value of anything. The plaintiff by his amended reply put in issue all these and other allegations of the amended answer, and the court thereupon referred the case back to the referee to take such further testimony as the parties had to offer. Other testimony was accordingly taken, mainly upon the question as to whether plaintiff had performed one hundred dollars' worth of assessment work prior to January first, eighteen hundred and ninety-three. Whereupon the referee reported the case back with his findings again

in favor of plaintiff. Exceptions and objections were filed to the report by both parties. The defendants, excepting only to the amount of damages found, moved the court for a confirmation of the report as to all the other findings. The court thereupon modified the findings of the referee, and rendered a decree for the defendants, from which plaintiff appeals. The testimony necessary to a full understanding of the case is noted in the opinion.          AFFIRMED.

For appellant there was a brief and an oral argument by *Messrs. J. H. and R. J. Slater.*

For respondents there was a brief and an oral argument by *Mr. Charles A. Johns.*

Opinion by MR. JUSTICE WOLVERTON.

There is no doubt that the plaintiff and one C. J. Finn made a sufficient and valid location of the White Pigeon Claim, November twenty-fifth, eighteen hundred and ninety-one. This is the finding of both the referee and the court below, and is borne out by the testimony. On October twenty-fourth, eighteen hundred and ninety-two, Finn sold and conveyed his interest in the claim to plaintiff, and thereupon plaintiff became the sole owner thereof. The fact that J. L. Baisley made a sufficient and valid location of the Mabel Claim, and S. B. Baisley of the Queen of the West, on or about the twelfth day of May, eighteen hundred and ninety-two, is also placed beyond dispute by the testimony, provided the lands and premises occupied by them were at that time open for location and occupancy by the public. The Mabel Claim is identical with the White Pigeon for a distance of one thousand two hundred and sixty feet southwestward from its

northeast line, and the Queen of the West covers the rest of it. The question then is, which of these parties has the better title to the premises occupied by the White Pigeon Claim? It is claimed by defendants that plaintiff forfeited his claim by not representing it as required by law,—that is to say, by failing to perform work and labor thereon in prospecting and developing it to the amount of one hundred dollars prior to January first, eighteen hundred and ninety-three, and, therefore, that it was open to exploration and location at the time defendants made their location of the Mabel and Queen of the West claims, and consequently their locations were valid, and that their title and right of posession is superior to plaintiff's. Under the United States statutes governing the location of mines, and the acquirements of patents therefor, the locator has one year from the first day of January succeeding the date of his location in which to perform his first annual work: United States Revised Statutes, § 2324, as amended January twenty-second, eighteen hundred and eighty, (Supplement to Revised Statutes, 276). The plaintiff, therefore, had until January first, eighteen hundred and ninety-three, in which to perform his annual labor upon the White Pigeon. If he failed to perform the required amount of labor prior to the last named date, the claim would thereafter be open for relocation by any person competent under the statute. But if, having failed in performing his annual labor, he resumed and performed work thereafter to the extent required by law, his rights after resumption would have been the same as if no default had occurred: Belk v. Meagher, 104 U. S. 282; Honaker v. Martin, 11 Mont. 91 (27 Pac. 397). But whether, after having resumed, and while in the actual possession, performing labor, and prior to the full per-

formance of the amount required by law, the claim
would be open to relocation, the authorities are di-
vided. See *Belcher Consolidated Mining Company* v. *Deferrari,*
62 Cal. 160, and *Honaker* v. *Martin,* 11 Mont. 91 (27 Pac.
397). The facts here do not present such a case. It
is, however, plain that if plaintiff had performed one
hundred dollars' worth of work on his claim prior to
the date of the alleged location by defendants of their
claims, as he insists that he has done, the territory
covered by the White Pigeon was not open for relo-
cation, and hence their locations could not be valid.
But, aside from the question of work, plaintiff claims:
*First,* that before defendants can avail themselves of
a forfeiture, they must plead it; *second,* that the court
erred in allowing defendants to file their amended
answer by which they attempt to allege a forfeiture;
*third,* that if the court rightfully allowed the amended
answer to be filed, then the forfeiture is insufficiently
alleged; and, *fourth,* that forfeiture was not shown by
the testimony. Of these in their order.

1. A mining claim subsequent to a valid location
is property in the highest sense of the term. It may
be bought and sold, and will pass by descent. It car-
ries with it the "exclusive right of possession and en-
joyment of all the surface included within the lines"
of location. The right is a valuable one, and is pro-
tected by law. It continues until there shall be a fail-
ure to represent the claim; that is, to do the requisite
amount of work within the prescribed time. The right
of possession and enjoyment acquired by location is
kept alive by the representation prescribed by law,
but, when not thus kept alive, the right is forfeited,
and the claim is thereafter open for relocation. In or-
der, therefore, to secure a valid location, it must be

established that rights acquired under a prior one upon the same claim have been forfeited. The affirmative of this proposition is always cast upon the party seeking to establish it, and hence, under the rules of pleading, it must be specially pleaded, where opportunity is offered, before a party can be heard to support it with evidence: *Renshaw* v. *Switzer,* 6 Mont. 464 (13 Pac. 127); *Hammer* v. *Garfield Mining Company,* 130 U. S. 291 (9 Sup. Ct. 548); *Belk* v. *Meagher,* 104 U. S. 279; *Morenhaut* v. *Wilson,* 52 Cal. 263; *Wulff* v. *Manuel,* 9 Mont. 276 (23 Pac. 723); *Quigley* v. *Gillett,* 101 Cal. 462 (35 Pac. 1040); *Mattingly* v. *Lewisohn,* 13 Mont. 508 (35 Pac. 114). Furthermore, "a forfeiture cannot be established except upon clear and convincing proof of the failure of the former owner to have the work performed, or to have improvements made, to the amount required by law": *Hammer* v. *Garfield Mining Company,* 130 U. S. 291 (9 Sup. Ct. 548).

2. Plaintiff contends that as objection had been interposed to all the evidence offered by defendants to show that plaintiff had not done or performed one hundred dollars' worth of labor upon the White Pigeon Claim, as required by law, for the purpose of establishing a forfeiture on the part of the plaintiff, and that as plaintiff had not offered his full evidence in refutation of the claim of forfeiture, all which was shown by affidavit, the court erred in allowing defendants' motion for leave to file the amended answer. The rule is well established that a party is not entitled to have his pleadings amended to conform to the proof where objection was made to the introduction of evidence to cover which the amendment is desired: *Mendenhall* v. *Harrisburg Water Company,* 27 Or. 38 (39 Pac. 399); *Beard* v. *Tilghman,* 20 N. Y. Supp. 736. But the

court below met this objection by referring the cause back to the referee, with directions to allow the parties to introduce other evidence touching the additional questions raised by the amended pleadings, so that the cause might be tried fully upon its merits. This, we think, was within the sound discretion of the court, and in furtherance of justice. Courts are always solicitous to reach the merits of every cause, and to that end are liberal in allowing amendments. There was no error in allowing the motion.

3. The ground of the next contention is that the amended answer, after stating the facts relied upon as constituting the forfeiture of plaintiff's claim, fails to state "that thereby the claim was forfeited," citing *Gelston* v. *Hoyt*, 16 U. S. (3 Wheat.), 247. This was a case of seizure of a ship and cargo for a supposed forfeiture, and, under the common-law form of pleading then in use, it was held that, after stating the facts, it was necessary to aver "that thereby the property became and was actually forfeited, and was seized as forfeited." Under our practice these technical forms of pleading are abolished, and it is now only necessary to set forth the facts constituting the cause of action or defense concisely without unnecessary repetition. Not having been tested by a demurrer, the allegations of forfeiture are sufficient after trial.

4. Has a forfeiture of the White Pigeon Claim by plaintiff been established by the testimony? Numerous witnesses were produced, and testified relative to the labor done upon the claim prior to January first, eighteen hundred and ninety-three, and, while they differed widely as regards the established value of the

work observed by them as having been done in the years eighteen hundred and ninety-one and eighteen hundred and ninety-two, they substantially agreed as to its amount and extent. Many years prior to the location of the White Pigeon there had been sunk on the ledge three different shafts. Some witnesses say two, but there were undoubtedly three. The larger one is sometimes called an incline. The shafts ranged from two to eight feet in depth and were of different relative dimensions. The witnesses gathered their information by passing over the claim; some casually, and some for the express purpose of ascertaining what work had been done. They all describe a new cut at the southwest corner of the claim. Some think it was within the boundary, and others say it was outside, but it is immaterial to this inquiry whether it was within or beyond the boundary. This cut was evidently made with the purpose of tunneling into the hillside, and thereby striking the ledge at some distance under the surface. It was from twenty to twenty-five feet long, three to four feet wide, and, in the face of the cut, or at its deepest point, four or five feet deep. They testify also to some fresh work that had been done in one of the old shafts. This is as far as they all agree. One of the witnesses, C. M. Foster, in rebuttal, recalled having seen a cut spoken of as a "crosscut" running across the ledge, presumably for the purpose of exposing it. The dimensions of this cut are given by the plaintiff as from eight to ten feet long, probably sixteen inches wide, and about twelve inches deep. A witness or two relates having seen some small prospect holes, two or three in number, sunk in the earth at a point where the ledge is broken off and lost sight of, probably for the purpose

28 Or.—9.

of finding the ledge again. This is a synopsis of all
the work observed by the defendants' witnesses, which
had been done in the years eighteen hundred and
ninety-one and eighteen hundred and ninety-two, after
the date of the location of the White Pigeon. It was
comparatively easy to distinguish the new work from
that done in sinking the shafts years prior, from the
action and indications left by the elements upon the
exposures made by the excavations. Many of these
witnesses were practical miners, and knew the value
of mining labor, and their estimate of the value of the
labor thus expended ranged from nine to thirty dol-
lars—none placing it higher than the latter sum.

Of the testimony offered to overcome this showing,
that of plaintiff in his own behalf is the strongest, and
is practically all that he has offered upon the ques-
tion, except as he is corroborated by other witnesses.
The work on the cut at the southwest corner of the
claim was done by Howard, Heffrom, and Ellis, under
his directions, for which work he paid Howard ten
dollars. Howard describes how it was done, and gives
the time expended in doing it. He says he worked
two and one half days, four hours counting as a day's
work. Heffrom and Ellis each worked an hour and a
half, and Bishop worked the same time. Bishop tes-
tifies that he, himself, put in about twenty days on the
claim, one of which is the one and one half hour's
work referred to by Howard. He says: "My work
consisted in crosscutting the ledge, sinking holes,
prospecting croppings, and working the croppings by
hand and mortar, and reducing the ore to pulp with
water and quicksilver, using acids, and separating the
gold from the quicksilver after working it." On cross-
examination he describes minutely what work he did
and how. He lived at Baker City, and generally went

from his home to the mine, a distance of twelve miles, and back again each day he worked upon it. Speaking of the first and second days that he was there, he says: "I prospected the ledge, the croppings." "Prospected by breaking the rock off the ledge, and sampling it." "I worked along the ledge there, picking and hunting for free gold rock, knowing that she carried free gold." "That was all I done these trips." Of the third time, he says: "I started to do surface work—that is, top work—where there was no ledge on the break of the hill, westerly from the old shaft, where the ledge is broken off, and no one has found it." "There were several holes there that I dug at that time; I cannot tell how many." Also, "worked on the ledge matter." "I picked rock, examined it, and prospected for the gold streak that I knew was there." In regard to the fourth trip in April, eighteen hundred and ninety-two, the former being along in March, he says: "I prospected around on that trip on the mine, east of the old shaft on the westerly end." "Removed no dirt at that time." "Removed some rock; yes." The trace left was "by the ledge being disturbed by breaking it." The fifth time, "broke off rock; put it in a mortar; panned it out with a gold pan." "I worked a little in the old shaft and hole number two; from the old shaft with a pick and shovel." The sixth trip, "I run a crosscut at that time." "I removed some dirt, not a great deal, away from the hanging wall on the southwest, westerly from the old prospect shaft." The seventh trip, "I cleared away around the ledge; took off rock; sampled it; marked it, and worked in hole number two with pick and shovel; threw out some dirt at that time; sampled it, and brought them to town." Eighth trip, "I worked on this slope westerly to see if I could find the ledge where the break

was, near the old prospect shaft, with the intention, if I could find it, of running a tunnel, and sinking and clearing out the old prospect shaft." "Prospected around with the pick some. I would break off portions of the ledge matter with my pick, and would break the rock with the eye of the pick, or a small hammer I had with me. I would take my glass and examine the rock, and if it did not suit me I would leave that portion of the ledge and go to another portion. I was hunting the pay chute. The reason I was hunting the pay chute was, I found a piece of rock three inches long and one half inch wide, and about one half an inch deep that had free gold in it." The ninth trip, "I picked down the rock in small pieces; marked them, and cut into the ledge quite a little piece." "I took some samples out of the old shaft number one, marked them and the part of the ledge they came from, and brought them out and took them back with me." Without following this testimony further in detail, suffice it to say that the foregoing fully illustrates the nature of the work done by plantiff for which he claims twenty days.

When asked to "give the number, size, and dimensions of any and all new holes and crosscuts, which were made on the claim after its location, up to January first, eighteen hundred and ninety-three," he replied: "On the westerly slope of the White Pigeon, westerly of the old shaft, there is a crosscut in the hill crosscutting the ledge, I should judge perhaps fifteen feet or more; it would be about two feet to thirty inches wide, twenty-four inches deep; and several holes,—I don't recollect how many,—in the vicinity of where this crosscut is, would average about three feet, I should judge, in length, and about two in depth. There is a great number of these, I don't

recollect how many; sunk several of them to try and find the ledge running parallel with the main White Pigeon, which I think would average two or three feet, and about twenty inches or two feet in depth. There was a hole, number three, an old shaft to the best of my recollection, about four feet long, about thirty inches wide, and about two feet deep. I enlarged hole number two by working, I should judge, about one third. The old shaft, I have made that larger, I should judge, about one foot. The length on one side was ten feet. I had work done on the tunnel site in the fall of eighteen hundred and ninety-two, about twenty feet long, four feet wide, and about four and one half or five feet deep at the big end." He further testifies that C. J. Finn rendered him a statement of thirteen days' work that he did upon the claim, but he has no personal knowledge of his having done any work, except that he saw Finn at the mine one day in June, eighteen hundred and ninety-two, and at that time he was prospecting the ledge for ore samples, some of which he produced. He further states that he spent eight days at home testing the samples of rock which he had taken from the mine, and had some twelve assays made of them, and that it was worth one dollar and fifty cents each to make such assays. All this work, he says, would "exceed one hundred dollars in value." The fact was established that miners' labor was worth from three to three and one half dollars per day. It may be conceded that if the nature of the work done and performed by the plaintiff fills the measure of work required to be done annually on all unpatented claims, he has complied with the law, but, if it does not, that he has fallen short of it. A summary of the value of

the labor performed will, therefore, be unnecessary whether classed as assessment work or not.

5. Section 2324, Revised Statutes of the United States, requires that on each claim located after the tenth day of May, eighteen hundred and seventy-two, and until a patent has been issued therefor, not less than one hundred dollars' worth of labor shall be performed or improvements made during each year. The time in which the first annual labor after location is required to be performed has been noted. Mr. Justice Miller, in *Chambers* v. *Harrington*, 111 U. S. 353, (4 Sup. Ct. 428,) after explaining the reasons for the adoption of this statute, says: "Clearly the purpose was the same as in the matter of similar regulations by the miners, namely, to require every person who asserted an exclusive right to his discovery or claim to expend something of labor or value on it, as evidence of his good faith, and to show that he was not acting on the principle of the dog in the manger." Wade, C. J., in *Remington* v. *Baudit*, 6 Mont. 141, (9 Pac. 819,) says: "The purpose of requiring one hundred dollars' worth of work or improvements on a mining claim each year is to so develop the mine as that a patent may issue for the claim. It is not the policy of the government to issue patents for the mineral lands until there has been a discovery, and sufficient work done upon the claim to demonstrate its value. * * * A liberal construction should be given the mining act of eighteen hundred and seventy-two, but it should not be so liberal as to authorize a claim to be held without representation, or a patent to be procured before any work had been done on the claim." This language is quoted with approval in *Honaker* v. *Martin*, 11 Mont. 91, (27 Pac. 398,) a later case from the same

state. Before patent can issue, the claimant is required to file with the register a certificate of the United States surveyor-general showing that five hundred dollars' worth of labor or improvements has been done or made by himself or grantors: United States Revised Statutes, § 2325. So that it is apparent the statute touching the location and acquirement of mining claims was enacted to subserve two purposes, namely, to insure good faith in the locator or claimant, and to require of him that he exhibit a claim, which, by reason of its development or the improvements made thereon or for its benefit, is of some value; and it was assumed by congress that five hundred dollars worth of labor or improvements would demonstrate its value as a mine. As to the nature of the labor or improvements, the statute would seem to require that the labor be performed or the improvements made for the development of the claim; that is, to facilitate the extraction of the metals it may contain: *Smelting Company* v. *Kemp*, 104 U. S. 636; *Remington* v. *Baudit*, 6 Mont. 141 (9 Pac. 819).

But it is insisted that whatever labor is performed for the purpose of prospecting a mine, fills the requirements of the statute, and in support of this position counsel cites *United States* v. *Iron Silver Mining Company*, 24 Fed. 568, and *Book* v. *Justice Mining Company*, 58 Fed. 107. In the former of these cases language is employed which would seem to indicate that the term "prospecting" was used in its broadest sense. It is there said that "work done for the purpose of discovering mineral, whatever the particular form or character of the deposit which is the object of the search, is within the spirit of the statute." It is disclosed, however, by the opinion, that labor was claimed for digging prospect holes on a placer mine, evidently in

trying to find veins, leads, and lodes, and it was contended that no work in that direction and for that purpose ought to be counted in an application for a patent to placer mining ground; and it was with reference to this state of facts that BREWER, J., with some hesitancy, used the language above quoted. The latter case simply announces the well-settled doctrine that "labor and improvements, within the meaning of the statute, are deemed to be done upon the location when the labor is performed or improvements made for the express purpose of working, prospecting, or developing the ground embraced in the location," and was said with reference to a tunnel commenced outside of the mining claim in dispute and intended for its development as well as other contiguous claims. The word "prospecting," when used with reference to annual labor to be expended upon a mining claim, is incapable of so broad a signification as is claimed for it. It is not used in the sense of "exploration and discovery," which is necesssary before a valid location can be made, but rather in the sense of "development and demonstration," that the value of the ledge may be determined, as distinguished from the ascertainment of its existence.

6. Now the question recurs whether picking rock from the walls of a shaft or from the side or outcroppings of a ledge, in small quantities, from day to day, making tests for the purpose of sampling it, breaking and examining it under a glass, crushing it in a mortar and panning it out, and carrying it away and making assays of it in attempting to find the "pay chute," as it is termed, is such as the law will permit the claimant to be credited with upon his account for annual labor performed? Such labor does not add to

the value of the claim, nor does it tend to the development of the mine. Five hundred dollars' worth of labor of this nature could easily be expended, and yet the surveyor-general would not be able to certify from an inspection of the mine that it had been done. On the contrary, on applying the test of reasonable value, he would find it far short of this amount: *Mattingly* v. *Lewisohn,* 13 Mont. 508 (35 Pac. 114); *Du Prat* v. *James,* 65 Cal. 555 (15 Morrison's Min. Rep. 344; 4 Pac. 562). Such work naturally leads one to question the good faith of the claimant, and to doubt his purpose to represent the claim except upon finding the "pay chute." This class of labor is not such as the statute contemplated, and will not avail the plaintiff; and it is apparent that without it he has failed in performing the one hundred dollars' worth of labor or improvements required by law. The actual work that he did which can avail him consists in the cut at the southwest corner of the claim, which cost him ten dollars; the crosscut made by him in one day for the purpose of exposing the ledge; several prospect holes that he sunk for the same purpose, which could be done within five days as the outside limit; and an enlargement of one or two of the old shafts. The court below very properly found that the assessment work did not exceed fifty dollars. The claim was therefore open to reëntry on January first, eighteen hundred and ninety-three; and, unless plaintiff had resumed work thereafter as required by law,* it was likewise open at the time defendants relocated it. Plaintiff, in April, eighteen hundred and ninety-three, entered one of the old shafts

---

* Revised Statutes of United States, § 2324, as amended by Supplement to the Revised Statutes, p. 276, declares a mining claim forfeited by failing to put one hundred dollars' worth of work and improvements thereon during any year prior to the issue of a patent, and allows a relocation by another person, provided the original locators "have not resumed work."

and spent an hour or so with pick and hammer in securing samples of the ore, and it is claimed for this that it was a resumption of work, but this is not a resumption under any of the authorities: *Honaker* v. *Martin*, 11 Mont. 91 (27 Pac. 398). It was further contended that defendants' entry was under a license from the plaintiff, but it is sufficient to say that this contention is not established by the evidence.

7. This disposes of the case with the exception of a question which is made as to the jurisdiction of a court of equity to take cognizance of the matter in issue, the possession and title being in dispute. It is clear from the testimony that at the commencement of the suit the plaintiff was absolutely out, and the defendants were in full possession of the claim. The inquiry has heretofore proceeded upon the assumption that the court had jurisdiction to determine all matters connected with the suit. We will now consider the contention of the respective parties upon this proposition. This may be termed a suit to enjoin a trespass, and for an account. It falls within the category of remedies which are of purely equitable cognizance. The trespass, threatened or actual, is the element which in proper cases lays the foundation for equitable interference; it is the primary "cause of suit." The power to assess damages is incidental, and does not exist as an equitable remedy, except in connection with the injunction to restrain the trespass, and is sustained upon the principle that, as a general rule, a court of equity having acquired jurisdiction for one purpose, will retain it for all, and proceed to the adjudication of legal as well as equitable rights, with a view to the administration of full relief: *Fleischner* v. *Citizens' Investment Company*, 25 Or. 130 (35 Pac. 174).

And upon the further ground of preventing a multiplicity of suits, Chancellor KENT, in *Livingston* v. *Livingston,* 6 Johns. Ch. 417, (10 Am. Dec. 354,) says: "This protection is now granted in the case of timber, coals, lead ore, quarries," etc., and quotes from Lord ELDON in *Thomas* v. *Oakley,* 18 Ves. 184, as follows: "The present established course was to sustain the bill for the purpose of injunction, connecting it with the account in both cases (waste and trespass), and not to put the plaintiff to come here for an injunction, and to go to law for damages." Mr. Daniels says: "The account depends entirely upon the injunction; it is incidental to, and consequential upon it; and if a person is entitled to the one, he is entitled to the other also, on the principle of preventing a multiplicity of suits; for, otherwise, he would be obliged to bring his action at law as well as in equity, — his action by way of satisfaction; his bill by way of prevention": 2 Daniel on Chancery Pleading and Practice, *1634. Courts of equity will enjoin a trespass only when there exists some equitable ground for interference, as where there is danger of irreparable mischief, or that the value of the inheritance is put in jeopardy by a continuance of the trespass, or when it becomes necessary to prevent a multiplicity of suits; the primary purpose of the suit is to quiet the possession. In ordinary trespass, or where the law affords an adequate remedy, equity refuses to interfere: *Bracken* v. *Preston,* 1 Pinney, 584 (44 Am. Dec. 420). The law is very old which permits the use of an injunction in restraint of waste. Lord ELDON says there is a writ at common law after action to restrain waste: *Smith* v. *Collyer,* 8 Ves. Jr. 90. An injunction for this purpose was and is now allowed a party out of possession against one in possession of lands to restrain irremediable damage to the in-

heritance, but the parties must be privies in title or estate, such as landlord and tenant, mortgagor and mortgagee, or tenant of a particular estate and remainderman, and the injunction will be allowed in all cases where an action will lie to recover possession of lands wasted or damages for the waste: *Chapman* v. *Toy Long,* 4 Sawy. 33 (Fed. Cas. No. 2610); and 3 Pomeroy's Equity, § 1348. But the remedy which permits an injunction against a trespass is of more recent origin, and was first granted by Lord THURLOW late in the eighteenth century. Lord ELDON relates the instance, of which he had a note, the case in which the order was made being now known as the "Flamang Case," as follows: "There was a demise of close A. to a tenant for life; the lessor being landlord of an adjoining close B. The tenant dug a mine in the former close. That was waste from the privity. But when we asked an injunction against his digging in the other close, though a continuation of the working in the former close, Lord THURLOW hesitated much; but did at last grant the injunction—*first,* from the irreparable ruin of the property as a mine; *secondly,* it was a species of trade; and, *thirdly,* upon the principle of this court enjoining in matter of trespass where irreparable damage is the consequence": *Hanson* v. *Gardiner,* 7 Ves. Jr. 307. See also *Mitchell* v. *Dors,* 6 Ves. Jr. 147. Since the time of Lords THERLOW and ELDON the remedy against trespass by injunction has become well established, and is now constantly brought into requisition. But, contrary to the injunction against waste, it is allowed a party in possession against a stranger whose entry is unlawful: 1 Spelling's Extraordinary Relief, § 336.

It is said that injunctions are now granted much more liberally than formerly, and that the tendency is

to break through the old distinction existing between waste and trespass: *Chapman* v. *Toy Long,* 4 Sawy. 33 (Fed. Cas. No. 2610); *Lowndes* v. *Bettle,* 33 Law Jour. (Eq.), 541. The authorities, however, when closely observed, would seem to indicate that the distinction which has been broken through is mostly the distinction which formerly existed in granting the injunction in one instance while refusing it in the other. The same conditions which lay the foundation for or that will support an injunction in case of waste will not suffice as against trespass. The material and vital distinction regards the possession of the relative parties litigant. In case of waste the privity existing between the parties will always enable the plaintiff, while out of possession, to maintain the suit; while, without the privity of estate or title as in case of trespass, posses- sion, or, what is tantamount thereto, the adjudicated or admitted right of possession, or an action pending therefor, is necessary to justify the interference of a court of equity: 1 Spelling's Extraordinary Relief, § 368. DEADY, J., in *Chapman* v. *Toy Long,* 4 Sawy. 33 (Fed. Cas. No. 2610,) states the rule broadly. He says: "It is also insisted that the complainants must first obtain possession of the premises by an action at law before a court of equity will interfere to restrain the defendants from committing the threatened tres- passes. ⁂ ⁂ ⁂ Wherever a trespass is attended with irreparable mischief, or a multiplicity of suits, or vexa- tious litigation, the remedy by injunction will be ap- plied the same as if it were a technical waste." That was a suit for injunction with an account against some Chinamen who were in possession of a placer mine, and who were disqualified from locating and acquir- ing title to mines from the government. The plaintiff had made location, and, without acquiring possession,

had entered suit. The court, however, awarded only a temporary injunction. The result of this case is approved by Mr. Justice FIELD in *Erhardt* v. *Boaro*, 113 U. S. 539, (5 Sup. Ct. 565,) without adopting the reasoning. He says: "The authority of the court is exercised in such cases through its preventive writ, to preserve the property from destruction pending legal proceedings for the determination of the title." The doctrine of the latter case is that injunction will issue at the suit of a person out of possession to restrain irremediable mischief going to the destruction of the substance of the estate, where the title is being litigated on the law side of the court. But we are now dealing with a suit for an injunction, coupled with an account for damages. It is sought to make the injunction perpetual, and at the same time recover damages for injuries sustained. The suit, in its object and purposes, is essentially different from one wherein a temporary or preliminary injunction only is sought to restrain injurious acts, irreparable in their nature, pending an action at law to determine adverse title or the right of possession. The latter is ancillary in its nature to the action at law; and in aid of it, that the plaintiff may reap the full benefit of his judgment when duly obtained; while, upon the other hand, as we shall finally see, the action at law is in some measure auxiliary to a suit for peremptory injunction coupled with an account.

It is a well settled rule of law that where the title is seriously in dispute the court will not entertain the injunction, except it be preliminary in its nature, and for temporary purposes only, to abide the adjudication of title by an action at law, where the estate is legal and not equitable. A peremptory or perpetual injunction is never granted in such cases, as that would be

to try the title in a court of equity, where the remedy is purely legal: *Clayton* v. *Shoemaker,* 67 Md. 219 (9 Atl. 635); *Old Telegraph Mining Company* v. *Central Smelting Company,* 7 Morrison's Min. Rep. 556; *Stevens* v. *Williams,* 5 Morrison's Min. Rep. 452. Equity will not try title to real property where the party invoking its aid has ample facilities and is in a position to settle the question at law; in other words, where he has an adequate remedy at law. The underlying reason for remitting a suitor to a court of law is that the right of trial by jury may not be denied any person under the pretence of equitable cognizance. So it is that in a suit to restrain a trespass, if the relief sought is a peremptory and permanent injunction, which would in effect estop subsequent adjudication as to title, the plaintiff must possess and show such a title, as against the defendant, as will protect him in the possession. A mere *prima facie* title, possessory in its nature, if not disputed, is sufficient: Spelling's Extraordinary Relief, § 365. But whatever this title may be, if seriously questioned, so that the validity thereof, whether possessory or otherwise, becomes one of the primary issues in the case, then a court of equity will refuse the relief, at least to the extent of making the writ peremptory until the title is settled at law. The rule of practice is well spoken by WHEELER, J., in *Burnley* v. *Cook,* 13 Texas 589 (65 Am. Dec. 79). He says: "In all cases where the right is doubtful, the court will direct a trial, and in the mean time, if there be danger of irreparable mischief, or if there is any other good cause of granting a temporary injunction, it will be ordered, so as to restrain all injurious proceedings; and when the plaintiff's right is fully established a perpetual injunction will be decreed." RUFFIN, C. J., in *Irwin* v. *Davidson,* 3 Iredell on Equity, 317, says: "But it is plain that the

jurisdiction to restrain trespasses, like that to restrain nuisances, is not an original jurisdiction of the court of equity, which enables this court, under the semblance of preventing an irreparable injury to a legal estate, to take a jurisdiction of deciding exclusively upon the legal title itself. Therefore, in such case, the plaintiff ought to establish his title at law, or show a good reason for not doing so; and, if he will not, this court cannot undertake, against a defendant's answer, to try the questions of title and trespass and nuisance; * * * and that the court of equity should only grant the injunction where the plaintiff is endeavoring to establish his title at law, and until he should have had a reasonable time allowed for that purpose." It is observed in *Stevens* v. *Williams,* 5 Morrison's Min. Rep. 453, that, "regularly the law action should be brought before application is made for an injunction, and that fact should be averred in the bill; but, where that has been omitted through mistake or inadvertence, the rule has been so far relaxed as to admit of the bringing of such suit after the filing of the bill, the plaintiff being put upon terms of commencing the suit within a short time and prosecuting it with diligence." In *Clayton* v. *Shoemaker,* 67 Md. 219, (9 Atl. 635,) it is held that in a case of controversy concerning the legal title the injunction will issue temporarily, so as to retain a *statu quo* condition until the legal title is determined, and if the result is favorable to petitioners then the injunction should be made perpetual. That was a case of continuing trespass.

From these authorities we get the principle and the rule of procedure. A court of equity, always solicitous that there should not be a failure of justice, will make its relief effective so that if, when the legal title and right of possession is settled, the prelimi-

nary injunction does not answer the purposes of the
suit, a peremptory injunction will issue, and such
other and further relief will be granted as is consist-
ent with equity. The injunctive jurisdiction of courts
of equity will be freely exercised to prevent trespass
upon mines, as the digging and removing ores there-
from, and extracting and disposing of their products,
reaches to the very substance and value of the es-
tate, and goes to the destruction of the very essence
thereof. A continued trespass of such a character
would almost inevitably lead to a multiplicity of ac-
tions for damages: 2 Beach on Injunctions, § 1155. The
general rule requiring the plaintiff to come with an
uncontroverted legal title extends also to trespass
against mines, but is relaxed somewhat in the case
of irreparable injury going to the very substance of
the estate: 10 Am. and Eng. Ency. of Law, 883;
*United States* v. *Parrott,* 1 McAllister, 271 (Fed. Cas.
No. 15998). LORD, C. J., in *Allen* v. *Dunlap,* 24 Or. 232,
(32 Pac. 675,) says: "The general rule that a court of
equity will refuse to take jurisdiction and award even
a temporary injunction in cases of a mere trespass, is
conceded; but there is an established exception in
cases of mines, timber, and the like, in which an in-
junction will be granted to restrain the commission of
acts by which the substance of an estate is injured,
destroyed, or carried away. In such cases, the injury
being irreparable, or difficult of ascertainment in dam-
ages, the remedy at law is inadequate." It has been
held in this state that ejectment will not lie to recover
a quartz mine located under the laws of the United.
States prior to the entire compliance with the require-
ments thereof entitling the locator or owner to a pat-
ent, but that, the right being possessory only, an ac-

28 OR.—10.

tion may be maintained in the justice's court for the recovery of the mine, and that that is the proper forum in which to determine such right: *Duffy* v. *Mix,* 24 Or. 265 (33 Pac. 807). A possessory action establishes the only title extant when it establishes the right of possession. Now, the jurisdiction of a justice's court, as regards a question of damages, extends in amount to two hundred and fifty dollars only, if, indeed, any damages could be recovered at all in an action for the recovery of the possession of a mining claim. But if ejectment would lie, it is problematical whether damages for withholding it would be adequate, because of the difficulty of its ascertainment. Besides, damages could only be recovered to the date of the commencement of the action, while equity with its injunctive powers will afford full relief. Hence plaintiff is required to go to the justice's court for his possession, and to the circuit court for his damages, and if this does not prove effective he must come here to a court of equity for his injunction, thus entailing a multiplicity of actions which it is the province of equity to prevent. So that here, owing to the peculiar state of the law, we find additional reason for the interposition of a court of equity by injunction; and therefore, where an action has been commenced or is pending in a justice's court to determine the possessory title to a mine, by a party out of possession, and damage is being done going to the impairment or destruction of the substance of the estate, the plaintiff in the action is entitled to an injunction, with an account, in a suit instituted for that purpose. An injunction will issue temporarily, however, to abide the result of the action; and should the action result favorably to plaintiff, it will be made permanent, with an award of damages commensurate with the injuries sustained. Even

where no action has been commenced, in a strong case, the injunction will issue, but the court will direct a speedy trial at law to determine the title and right of possession where controverted by the defendant, and the peremptory character of the injunction will be made to depend upon the result of the law action: 1 Spelling's Extraordinary Relief, § 367. From the testimony adduced at the trial it is apparent that plaintiff has not made such a case as would entitle him to even a temporary injunction to abide the action to determine the right of possession. The decree of the court below is therefore affirmed.

AFFIRMED.

Argued July 30; decided October 14, 1895; rehearing denied.