Argued October 26, 1953, affirmed February 10, petition for
rehearing denied March 24, 1954

## KRAMER *v.* TAYLOR ET AL. and TRICKEL
266 P. 2d 709

*Harold Banta* argued the cause for appellant. On the briefs were Hallock, Banta, Silven & Horton, of Baker.

*Lyle R. Wolff,* of Baker, argued the cause and filed a brief for respondents J. T. Taylor and Josephine M. Buchen.

Before LATOURETTE, Chief Justice, and WARNER, ROSSMAN, LUSK, TOOZE and PERRY, Justices.

WARNER, J.

This suit was brought by H. F. Kramer against J. T. Taylor and Josephine M. Buchen for the purpose of quieting title in him to two unpatented lode mining claims situated in Baker county, Oregon. The defendant Culley Trickel, intervened, alleging that he is the owner of all the right, title and interest claimed by the defendant Taylor in and to the contested property and praying for judgment in that tenor. From a decree predicated upon findings of fact and conclusions of law in favor of the defendants Taylor and Buchen and against the claims of the plaintiff Kramer and the intervenor Trickel, the plaintiff alone appeals.

Sometime in 1931 the predecessors in interest to Taylor and Buchen filed adjacent claims and named them, respectively, the Bengal and the Provider. They were never patented. The southerly boundary of the Bengal is co-extensive with the northerly boundary of the Provider. Thereafter, in September 1951, Kramer relocated the two claims, covering substantially the same area. The northerly claim corresponding to the Bengal he designated as Tungsten Mine No. 2, and his southerly claim as Tungsten Mine No. 1. Inasmuch as the boundaries of the first two claims filed upon are more or less coterminous with those filed upon by Kramer and since no issue is raised relative to any deviations in their respective boundary lines, we will hereinafter refer to them as the north

claim (Bengal or Tungsten Mine No. 2) and the south claim (Provider or Tungsten Mine No. 1). The claims together were known and operated as the old Cliff Mine and extensively developed in earlier days. Taylor and Buchen, by their respective answers, each assert an undivided one-half interest in the claims as a successor's interest to the original locators.

The two claims, each 600 feet wide, lie on a mountainside and for a distance of 3,000 feet slope from the north to the south. The discovered vein runs northerly and southerly through their approximate center. They disclose the presence of much previous mining activity, particularly in an area marked by a shaft sunk into the vein on the Provider claim at a point about 290 feet south of its northerly boundary. In this shaft, now suffering from long disuse, are the remains of four drifts at different levels which were employed by defendants' early predecessors for the exploration and extraction of minerals from the vein. Two follow the vein in a southerly direction and two follow its northerly course. The apparent overall objective of the defendant owners was to rehabilitate the operation for the mining of tungsten ore which is present, with traces of gold. In keeping with this purpose, the defendants began, prior to 1950, an open cut in a ravine on the south claim and approximately in the middle of that claim. Their project contemplated a tunnel pointing in the direction of the shaft and, among other things, was planned to intersect the shaft at its 90-foot level. The tunnel excavation was begun in the assessment year for 1950-51. It is this work in the tunnel area which is the real subject of the controversy between the parties.

It is the contention of the plaintiff Kramer that the defendants had forfeited all rights in the claims,

for the following reasons: (1) the defendants in the year 1950-51 failed to do the amount of annual work required under the federal law (30 USCA § 28); (2) if the amount of such work was sufficient, the plaintiff asserts it was for the purpose of further prospecting and exploring the claims rather than for their development; and (3) in any event, no work was done on the north claim and it received no benefit from the tunnel construction started on the contiguous south claim. The appellant also urges, as a fourth proposition, that the filing made in 1931, under which defendants claim title, is void. The first three matters are primarily challenges to the sufficiency of the evidence.

The defendants reply that the value of the assessment work done by them in 1950-51, reflected primarily by the tunnel construction under the direction of Taylor, exceeded $200 in value and was for the purpose of developing the known vein running north and south through the approximate center of both claims and, although done on the south claim, was nevertheless intended for the benefit of the two claims. The circuit court found for the defendants in all these matters, as well as for the validity of the challenged 1931 filings.

So far as pertinent, 30 USCA § 28 reads:

"The miners of each mining district may make regulations not in conflict with the laws of the United States, or with the laws of the State or Territory in which the district is situated, governing the location, manner of recording, amount of work necessary to hold possession of a mining claim, subject to the following requirements * * *. On each claim located after the 10th day of May 1872, and until a patent has been issued therefor, not less than $100 worth of labor shall be performed or improvements made during each year. * * *

and upon a failure to comply with these conditions, the claim or mine upon which such failure occurred shall be open to relocation in the same manner as if no location of the same had ever been made * * *.

"Where a person or company has or may run a tunnel for the purposes of developing a lode or lodes, owned by said person or company, the money so expended in said tunnel shall be taken and considered as expended on said lode or lodes, whether located prior to or since May 10, 1872; and such person or company shall not be required to perform work on the surface of said lode or lodes in order to hold the same as required by this section * * *."

The foregoing section makes the location, manner of recording and amount of work necessary to hold possession of a mining claim subject to such provisions of state and territorial law as are not inconsistent with the laws of the United States. In the exercise of this power the Oregon legislature has included in the mining code §§ 108-301—108-326, OCLA (ORS 517.010—517.330), which are in the nature of rules and regulations relating to mining locations and annual assessment work comprehended by 30 USCA § 28.

Section 108-314, OCLA (ORS 517.210) provides:

"Within 30 days after the performance of labor or making of improvements, required by law to be annually performed or made upon any mining claim, the person in whose behalf such labor was performed, or improvements made, or someone in his behalf, knowing the facts, shall make and have recorded in the mining records of the county in which said mining claim is situate, an affidavit setting forth:

"(1) The name of the claim or claims if grouped and the book and page of the record where the location notice of said claim or claims is recorded.

"(2) The number of days' work done and the character and value of the improvements placed thereon, together with the location of such work and improvements.

"(3) The date or dates of performing said labor and making said improvements.

"(4) At whose instance or request said work was done or improvements made.

"(5) The actual amount paid for said labor and improvements, and by whom paid, when the same was not done by the owner or owners of said claim."

■ Although an appeal of a suit in equity is tried here *de novo,* yet when the proof is evenly balanced we are not justified in rejecting a finding of the lower court where existed the opportunity, denied to us, of evaluating the testimony of the witnesses in the light of their demeanor and manner of testifying. *Bogle v. Paulson,* 185 Or 211, 228, 201 P2d 733; *Public Market Co. v. Portland,* 171 Or 522, 561, 130 P2d 624, 138 P2d 916; *Page v. Kay Woolen Mill Co.,* 168 Or 434, 441, 123 P2d 982. Because of the unique factual situation present in a case of this character, the court's findings attain additional weight when, as we learn here, the court visited and viewed the premises in controversy during the course of the trial.

■ The burden of proof to establish a forfeiture of mining claims by reason of failure to do the work required is upon the party asserting such forfeiture. *Whalen Consol. Copper Min. Co. v. Whalen,* 127 F 611; *Copper State Mining Co. v. Kidder,* 20 Ariz 224, 179 P 641, 642.

■ We also take heed of the rule that a forfeiture cannot be established except upon clear and convincing proof of the failure of the original locator to have work performed or improvements made in the amount required by law. *Schlegel v. Hough,* 182 Or 441, 444, 186

P2d 516, 188 P2d 158; *Bishop v. Baisley,* 28 Or 119, 127, 41 P 936; *McCulloch v. Murphy,* (CC) 125 F 147, 150. Where a forfeiture of a mining claim is involved, the appellate court should not disturb a finding of the trial court which prevents such forfeiture, unless it is clearly made to appear that such finding is not supported by the evidence (*Nevada Exploration & Mining Co. v. Spriggs,* 41 Utah 171, 124 P 770, 773); and if the testimony relative to value is conflicting, it is proper to consider whether there has been a bona fide attempt to comply with the law. *Quimby v. Boyd,* 8 Colo 194, 6 P 462, 471.

By appellant's first assignment of error it is urged that the trial court erred in finding that the evidence established that $200 worth of work was done on the claim by Taylor and Buchen during the fiscal year of 1950-51. It was the circuit court's determination that during the period last mentioned, the defendant Taylor had performed 17 days of work at a reasonable value of $12 per day, making a total of $204, and that in so doing he drove a tunnel for a length of 16 feet, having a reasonable value of $14 per foot for a total value of $224. The judge's findings on this phase conclude with the statement that "the Court definitely finds that the evidence establishes that $200.00 was the reasonable value of the work done during the last year of 1950-1951."

It is appellant's contention that, giving the record a construction most favorable to respondents, they can at best claim only 16 days of labor at $12 per day and 11 feet of tunnel construction at a value of $14 per foot and that, figuring on a per diem basis, the work done would be worth not to exceed $194 and, computing it on a footage basis, the value falls as low as $154.

Summarizing these differences in terms of days, the parties are but one day apart and, in terms of tunnel distance, a difference of 5 feet. We note that, in making this finding, the court's determination rests upon a two-way result, first, in evaluating the amount of the labor performed and, second, in giving value to the finished result.

■ The law is settled in this state that the test to be applied, in determining whether or not the claimant has satisfied the law with reference to annual assessment work done or improvements made, is measured not in terms of days but in terms of dollars. It is the worth at the conclusion of the work, no matter how many days were employed in achieving that result. *Schlegel v. Hough,* supra, at page 446. Also see *Penn v. Oldhauber,* 24 Mont 287, 61 P 649, 650, cited with approval in the Schlegel case. Although this rule was recognized by the lower court in its opinion, it was not in error in receiving and giving consideration to testimony relating to the time element involved in making its final determination of the value of the work done. On the other hand, the importance of Taylor's work records and alleged discrepancies therein is materially minimized by the rule; and, therefore, they do not merit the extent of attention given to them in appellant's brief.

■ Our own examination of the record inclines us to accept the circuit court's finding. We are also impressed by the fact that the defendants were making a bona fide effort to comply with the law in their work and find no merit in appellant's first assignment of error.

We now give attention to appellant's second proposition, i.e., that the court erred in ruling that the tunnel was for the purpose of developing an existing

known vein rather than for the purpose of prospecting and exploring for one not known to exist.

The plaintiff claims that development and demonstration of a known ledge constitutes annual labor for which credit will be given but that labor expended in prospecting or making explorations to locate a ledge not known to exist is not in this category. He relies on *Schlegel v. Hough,* supra, at page 447, and *Bishop v. Baisley,* supra, at page 135. Both cases, as a matter of law, give support to this contention.

Here we are again confronted with an examination of the record to ascertain whether or not the tunnel construction, begun by defendants in 1950 and claimed as the basis for the assessment work done for the 1950-51 period, was in fact, as found by the court, "for the purpose of developing an existing known vein of tungsten, which tunnel ran in the direction where everyone believed the vein to run", and the court's further finding that "Taylor's work was based on a reasonable theory that he would eventually strike the existing known vein".

■ Our own examination of the record persuades us that no one can successfully controvert the conclusion that the work done on the tunnel was based upon a reasonable theory and honest expectation that, if pursued in the direction planned, that is, to intersect the previously constructed shaft to the north, it would strike the tungsten vein so evident in the shaft itself.

■■ On the question of whether the tunnel operation was solely one of exploration rather than development, we think that the testimony preponderates in favor of the theory of development. It is true that construction of the tunnel had elements savoring of discovery and exploration, that is, the location of the southerly drift of the vein previously discoverd and ex-

ploited in its more northerly reaches in the area of the old mining shaft; but the fact that an attempt is made to discover ore in the course of driving a tunnel or drift does not preclude such work from being assessment work. It is the general plan and intent behind it which controls. *New Mercur Mining Co. v. South Mercur Mining Co.*, 102 Utah 131, 128 P2d 269, 274; 58 CJS 130, Mines and Minerals § 72.

There is, in addition to the testimony of the defendant Taylor and others, that given by Carl Milton and Walter Jefferson, two seasoned men with experience in that mining area varying from 20 to 45 years, which amply warrants the court's finding that the work done on the tunnel was a part of an overall development plan for the contested claims. Mr. Milton testified:

"Mr. Wolf: What advantages, if any, would that tunnel in the ravine have to the development of the mines located north of it?

"A. Well, it would be an adit to the shaft.

"Q. I am referring to the tunnels and the shaft located around the shaft-house at that point.

"A. That's what I thought. It would be an adit to the shaft, which would be of benefit for air ventilation. It could be used as a haulage tunnel, and also to my estimation would be an advantage to explore this ground between this particular point and the shaft. For this reason I believe it would be worthwhile.

"Q. Now, let's see, you said it could be used for air, as an exploratory tunnel and a haulage tunnel.

"A. Yes, I have worked in mines where they have, for instance, like this here, instead of hauling ore clear to the surface, they will go in with an adit to the shaft and make a shaft or I mean a station there, which I believe would have to be done here, as this shaft out here is a-way too small for any large production. That would be a big advantage.

That would be your haulage tunnel to your surface, you see. That would be a big advantage there. Another thing I think Mr. Taylor done and he had a pretty good idea, was placing that tunnel according to the strike of those veins. It doesn't look like to me he was doing that just to find a soft place to dig."

The witness Jefferson, in response to a like question, answered:

"A. Well, the greatest advantage to a piece of property of any kind whether there or anywhere else is to cut your ledge of ore at the very lowest depth possible to give you as much back-material overhead as possible. That could be stoped out, you see, and hauled out on a gravity-haul, because it is cheaper to haul ore out on a gravity-haul than it is to hoist it out of a shaft.

"Q. You think that particular tunnel has any advantage to those pieces of property—those two claims?

"A. Well, if it was run on in to connect with the old workings, yes."

We have held that the word "improvement" as employed in 30 USCA § 28 means, if reasonably permanent in character, such an artificial change of the physical conditions of the earth in, upon or so reasonably near a mining claim as to evidence a design to discover mineral therein or to facilitate its extraction. *Fredricks v. Klauser,* 52 Or 110, 116, 96 P 679.

■ In the exercise of judgment as to when work should be done, a wide latitude is allowed the locators of mining property when consisting of several claims, as here, as to the place or places where the work shall be accomplished to develop such a group of claims; and this is true without giving consideration to whether or not the work is wisely or judiciously done or the system adopted may or may not be the best that could have

been devised under the circumstances. *Wailes v. Davies* (CC) 158 F 667, 670; *Love v. Mt. Oddie United Mines Co.*, 43 Nev 61, 181 P 133, 184 P 921; 58 CJS 130, Mines and Minerals § 72. A court will not be permitted to substitute its own judgment as to the wisdom and expediency of the method employed for developing a mine in place of the judgment of the owner. *Mann v. Budlong*, 129 Cal 577, 62 P 120. Also see *Nevada Exploration & Mining Co. v. Spriggs*, supra; 2 Lindley, Mines 3d ed, 1561, § 631.

We find that appellant's second assignment of error is without merit.

Next in order for review is the assertion that the court erred in finding that the work done by the defendants on the south or Provider claim inured to the benefit and development of the north or Bengal location.

■ No claim is made by the defendants that any actual work was performed on the Bengal claim during the assessment year of 1950-51. It is their position that their labors in the tunnel during that period redounded to the benefit of both claims and that under the authority of *Jackson v. Roby*, 109 US 440, 444, 27 L ed 990, 3 S Ct 301 (Colo 1883) the work there done by them should be so credited. In the Jackson case Mr. Justice Field, following *Smelting Co. v. Kemp*, 104 US 636, 655, 26 L ed 875, held: "* * * the law [RS 2324, now 30 USCA § 28] permits a general system to be adopted for adjoining claims held in common, and in such case the expenditures required may be made, or the labor be performed, upon any one of them." Also see *Fredricks v. Klauser*, supra, and the extended annotation of cases in point appearing in 30 USCA § 28, note 318. Whether the work done upon one claim for the benefit of a group does so benefit

all claims is a question of fact. 2 Lindley, Mines 3d ed, 1555, § 630.

◼ He who make a relocation based upon an alleged forfeiture of the preceding right to possession of the premises, by reason of the predecessor's neglect to make the required improvement, has the burden of establishing the fact of such a loss. However, a prima facie case in the relocator's favor is made when it appears that the labor was not performed within the limits of the claim during the year relied upon, whereupon the burden shifts to the preceding location claimant, making it incumbent upon him to prove that, although the annual assessment or any part thereof was done outside the claim described, the work was performed for and inured to the benefit of such mine. *Merchants' Nat. Bank v. McKeown,* 60 Or 325, 329, 119 P 334; *Fredricks v. Klauser,* supra, at page 115; 58 CJS 144, Mines and Minerals § 82; Morrison, Mining Rights 16th ed, 118.

These pertinent facts are made evident to us from the trial record: What are now known as the Provider and Bengal claims were, as long ago as 1896, known by defendants' predecessors as the Cliff and Anna Lulu claims and together operated as the Cliff Mine, a name which appears to cling to the present operation. Then, and apparently as late as 1931, the prime interest of the locators was the extraction of gold ore. During the course of the early development of these quartz holdings, defendants' predecessors, at a time not disclosed by the record, sank the shaft previously referred to, which is approximately 225 feet deep at a point about 290 feet south of the north boundary of the south claim, a boundary line common to both claims. This shaft is astride the apparent course of the known vein about 650 feet from the most north-

erly prospect hole in the Bengal claim and about 460 feet north of the tunnel portal located in the south or Provider claim; in short, it is almost midway in the course of the ore vein as it is presently known to lie and as determined by the prospect holes, the shaft walls and other indices of merit. The shaft was obviously designed to service both claims by the extraction of ore from the vein on the north side of its location and as it was found on the south side.

From the shaft run four old drifts, each at different levels, made by earlier operators, two in a southerly direction and the other two, including the longest, in a northerly direction. The longest drift, as shown by the Nelson map introduced by plaintiff, terminates under the ground of the north claim. Before the present activies of the defendants, the ore obtained from the exploitation of these drifts was mechanically hoisted to the surface through the shaft and dumped. Although this northerly drift is said to be stoped out to a distance of 150 feet, we find no one suggesting that further mining in that general direction would be in vain. At the time of the trial access to the other northerly drift running from the shaft at its lowest level was impeded by debris which had blocked that part of the shaft during prior years. The possibilities of its further exploitation are unknown, although there is testimony to the effect that richer findings could be at the base of this shaft. Then, as now, the shaft and its situs are the central point of all operations pertaining to the two claims and where past, as well as present, developments either radiate from or point toward. Thus the tunnel in question is being driven from the south to the north with a plan and expectation of intersecting the shaft at its 90-foot level with a design to better its future use by, among

other things, improving its ventilation and drainage and offering a more efficient and cheaper outlet for ore culled from the ground in that area. As stated by one witness, a miner, the tunnel is an "adit" to the shaft, which in mining vernacular is "a nearly horizontal passage from the surface, to provide access, haulage, drainage, ventilation etc." Webster's New International Dictionary 2d ed.

Although the defendants can claim no credit on their 1950-51 assessment work for improvements made subsequent to July 1, 1951, the record discloses later work of a substantial nature made in and about the shaft which emphasizes that it is the heart of the mining activity for both claims and gives substance to defendants' bona fide plan for an overall development of the claims as one operating unit.

In *Smelting Co. v. Kemp*, supra, Mr. Justice Field said: "* * * It would be absurd to require a shaft to be sunk on each location in a consolidated claim, when one shaft would suffice for all the locations * * *."

The strategic location of this shaft, together with its known historic use, impels us to conclude that it is the central point of importance and usefulness in all present and future development of the two claims, insofar as the owners can at present reasonably conceive and plan that development for the benefit of both. It, therefore, follows that any work and labor designed to improve the shaft inure and redound to the improvement of each contiguous area which it serves.

That the defendants at all times intended that the work done on the tunnel was for the benefit of both claims is made patent by the proofs of assessment labor filed for the years ending in 1950 and 1951. This

recorded proof for each annual assessment period is made jointly for the two claims, and the recitals therein leave no doubt that the owners conceived and designed the work as an improvement benefiting both properties. It was work which coordinated with their concurrent efforts to secure funds by federal financing for the purpose of rehabilitating and expanding the shaft and with a view to getting to the bottom thereof where the best tungsten was supposed to be.

It is permissive that one general system was conceived and appeared well adapted in the light of the physical surroundings and the geological information then available. *New Mercur Mining Co. v. South Mercur Mining Co.*, supra. We also subscribe to the statement found in *Nevada Exploration & Mining Co. v. Spriggs*, supra, that "it is not necessary for a claimant to prepare plans and specifications with regard to how he intends to develop his claim", nor does the law require that the annual expenditure shall be applied in the way of the best possible development of the claim. *Sherlock v. Leighton*, 9 Wyo 297, 63 P 580, 583, 934.

The shaft in question, as we have noticed, was initially conceived as an integral and important part of the development of both claims and so used. It still continues to be the objective of further development and use by restoration in whole or in part, particularly by improvement and use through the medium of the tunnel under construction. We have no right to assume that when the contemplated improvements already begun are completed, it will not function as of yore in its historic capacity as a unit in the extraction of ore from the northern claim with which it is presently connected by two definable drifts in that direction.

■ The appellant Kramer is a man with consider-

able mining experience. His aggressive eagerness to acquire and locate on the north claim, as well as the contiguous one to the south, coupled with his assertion that he found evidence of gold and tungsten on the surface of the Bengal or north claim, gives substance to his faith in its potentialities as an area for further exploitation and source of mining profit. Under the circumstances here present and taking into consideration the whole of the environment (*Copper Mt. M. & S. Co. v. Butte & Corbin Consol. Co. & S. M. Co.,* 39 Mont 487, 104 P 540, 542) it is impossible for us to conclude that those things which improve and develop the existing shaft are not beneficial to the north claim or were not so intended. The circuit court, we think with justification, found that the work done by Taylor on the tunnel was to facilitate the taking of ore from both the claims.

Appellant's last assignment of error takes issue with the circuit court for its failure to void the original Bengal and Provider locations made in 1931 and gives as a reason that they were predicated upon a single boundary discovery and the location work was not done and recorded within the time required by law.

This phase of appellant's argument is predicated upon a record of events occurring more than 20 years ago, as evidenced by the location notices filed by defendants' predecessors in interest, i.e., by Alma Williams and M. F. Newton, on September 23, 1931. One notice describes the location of the discovery or prospect shaft of the Bengal claim, together with the boundaries thereof, and the other notice supplies similar information concerning the Provider claim. Appellant points to § 108-301, OCLA (ORS 517.010), providing, among other things, ''the number of linear feet claimed along the vein or lode each way from

the point of discovery", and claims that the notices are fatally deficient in this respect.

He also claims that the notices are defective because they were posted on the claims on June 15, 1931, but not filed until September 23, 1931, more than 60 days after the posting. In support of this contention he relies upon § 108-302, OCLA (ORS 517.030) which requires that each locator shall, within 60 days from and after the posting of the required location notices (§ 108-301) file with the county clerk a copy of notices posted with an affidavit showing that the work required to be done by § 108-303 (ORS 517.020) had been done and performed. Appellant claims that because of these alleged defects the claims filed in 1931 are null and void, relying upon § 108-310, OCLA (ORS 517.050).

■ This fourth claim of error must be resolved against the appellant on the authority of *Sharkey v. Candiani*, 48 Or 112, 121, 85 P 219, 7 LRA NS 791, which holds that the discovery of a lode on a given claim after the filing of imperfect notices of location validates the prior insufficient location if no adverse rghts have accrued between the filing of the imperfect notice and the discovery made. Also see *Steele v. Preble*, 158 Or 641, 667, 77 P2d 418, where Mr. Justice ROSSMAN quotes with approval the following from *Thomas v. South Butte Mining Co.*, 211 F 105:

> " 'Where mining claims which have passed out of the hands of the original owners have stood unchallenged for years, and have been developed to a considerable extent, the certificate of location, if in due form, may be deemed presumptive evidence of discovery and of a valid location. Vogel v. Warsing, 146 Fed. 949, 77 C.C.A. 199; Cheesman v. Hart (C.C.) 42 Fed. 98.' "

The decree of the circuit court is affirmed.